**UNITED STATES of America, Plaintiff,**

**City of Quincy, and Town of Winthrop, Plaintiff–Intervenors,**

v.

**METROPOLITAN DISTRICT COMMISSION, Commonwealth of Massachusetts, Massachusetts Water Resources Authority, and Boston Water and Sewer Commission, Defendants.**

**CONSERVATION LAW FOUNDATION OF NEW ENGLAND, INCORPORATED, Plaintiff,**

v.

**METROPOLITAN DISTRICT COMMISSION and William Geary, Chairman of the Metropolitan District Commission, Defendants.**

Civ. A. Nos. 85–0489–MA, 83–1614–MA.

United States District Court,
D. Massachusetts.

Feb. 8, 1988.

Douglas Wilkins, Asst. Atty. Gen., Boston, Mass., for State defendants.

Sanford W. Harvey, Jr., General Counsel, Massachusetts Water Resources Authority, Boston, Mass., for Mass. Water Resources Auth.

Laura Steinberg, Sullivan & Worcester, Boston, Mass., for Boston Water & Sewer Auth.

Harlan M. Doliner, Gregor I. McGregor, McGregor, Shea & Doliner, Boston, Mass., for Town of Winthrop.

Andrew S. Hogeland, Asst. U.S. Atty., U.S. Dist. Court, Boston, Mass., Elizabeth Yu, Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Samuel Hoar, Bradford S. Gentry, Goodwin, Procter & Hoar, Boston, Mass., for Cons. Law Foundation of N.E.

Peter L. Koff, Weston, Patrick, Willard & Redding, Boston, Mass., for City of Quincy.

John M. Stevens, Laurie Burt, Foley, Hoag & Eliot, Boston, Mass., for Mass. Water Resources Authority.

Peter Shelley, Conservation Law Foundation, Boston, Mass., for Cons. Law Foundation of N.E.

Anne Phillips Obilby, Ropes & Gray, Boston, Mass., for Compliance Monitor.

Richard A. Henderson, Town Counsel—Cohasset, Cohasset, Mass., Robert L. Marzelli, Town Counsel—Marshfield, Marshfield, Mass., James A. Toomey, Town Counsel—Hingham, Murphy, Hess, Toomey and Lehane, Braintree, Mass., James B. Lampke, Town Counsel—Hull, Hingham, Mass., Kenneth Tatarian, Special Counsel—Scituate, Boston, Mass., Paul G. Wallach, Michael Kendall, Special Counsel—Hull, Hale and Dorr, Boston, Mass., for proposed plaintiffs-intervenors.

Michael J. Meagher, Gregory L. Benik, Hinckley, Allen, Snyder & Comen, Boston, Mass., for Nahant S.W.I.M. Inc.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This matter is before me on the motions to intervene of Nahant SWIM, a public interest group based on the North Shore of Massachusetts Bay, and the Towns of Hull, Cohasset, Marshfield, and Hingham, all towns located on the South Shore of Massachusetts Bay (collectively, "the South Shore Towns"). They seek to intervene in this case pursuant to both § 1365(b)(1)(B) of the Federal Water Pollution Control Act ("FWPCA") and Rule 24, Fed.R.Civ.P., to protect their rights to unpolluted bay water, allegedly threatened by the siting of a sewage outfall somewhere in Massachusetts Bay and other decisions to be made in this cleanup effort.

While the dispositive issue presented is one of timeliness, the motions raise a fundamental question of the unconditional right of the parties to intervene. Because these issues are likely to re-occur as later, difficult decisions focus on other communi-

ties, I have dealt with the subject in a somewhat extended fashion.

## I.

A brief history of this litigation is necessary to give context to the instant motions. On June 7, 1983, the Conservation Law Foundation ("CLF") filed suit in this Court against the Metropolitan District Commission ("MDC") and the Environmental Protection Agency ("EPA"). They alleged that the MDC, responsible for sewage disposal for the district, was violating the FWPCA, 33 U.S.C. § 1251 *et seq.*, the discharge permit issued to the MDC by the EPA under the Act, and several EPA compliance orders by dumping minimally treated and untreated sewage and wastewater into Boston Harbor. On January 31, 1985, the United States filed a similar suit, and the cases were consolidated. In the spring and summer of 1985, two communities directly affected by the MDC's actions, the Town of Winthrop and the City of Quincy, moved for and were granted intervention in the case.

In September, 1985, this Court found the MDC and its successor, Massachusetts Water Resources Authority ("MWRA"), to be in violation of the FWPCA, the permit issued to it, and a 1980 administrative compliance order issued by the EPA. Since that decision, the efforts of the parties and the Court have been directed to the creation of a new treatment system to alleviate the pollution problem in the Harbor. After review of voluminous records, and submissions of the parties, and after hearing, I issued, on May 8, 1986, a long-term scheduling order establishing milestones and target dates for the reconstruction effort. In the over two years since that order issued, I have received monthly progress reports from the MWRA. These reports have been reviewed by the Compliance Monitor, and I have issued a monthly order assessing the progress, or lack of it, directing further efforts. To date, twenty-five compliance orders have issued, tracking closely the status of the schedule.

Under the schedule approved in May, 1986, MWRA is obligated to build a primary treatment facility on Deer Island which, by 1994, is expected to provide minimal treatment of sewage, to include solids removal and chlorination. The remaining material will then be pumped into Massachusetts Bay via an effluent pipe. Accordingly, MWRA began formal planning of the Bay outfall in 1986, and, on June 24, 1986, filed an environmental notification form ("ENF") giving formal notice that the process of selecting a site for the terminus of the outfall had started, listing Massachusetts Bay as one of the candidate sites under consideration. The ENF was published in the *Environmental Monitor.*

Thus, it was clear in May, 1986, that Massachusetts Bay was one siting for the outfall. Indeed, to anyone familiar with the record, it was clear that the Bay was a principal site, especially since ocean dumping was precluded by Congressional action beginning in November, 1985. Moreover, a close reading of my order reflected Winthrop's concern with discharge into the Bay. The MWRA was directed to investigate the effect of discharges through the new outfall on the water quality of waters adjacent to Winthrop (the outer coastline of Winthrop borders the Bay). The MWRA was further directed to conduct studies to insure there was no deterioration in the quality of state water standards as a result of the new outfall.

It is against this backdrop that Nahant and the South Shore Towns, communities bordering on the Massachusetts Bay, have become concerned about the impact of the placement of the outfall on the quality of the water in the Bay. They assert that intervention is appropriate under § 1365(b)(1)(B) which provides an unconditional right to citizens like themselves to intervene, making Fed.R.Civ.P. 24(a)(1), intervention as of right, the applicable standard to be applied here. They also argue in the alternative that intervention under Rule 24(a)(2) or permissive intervention under Rule 24(b) is appropriate. The MWRA, the Commonwealth of Massachusetts, and the EPA oppose the motion mainly on the ground that the motion is untimely under Rule 24(a)(1). None of the opponents to

the intervention motion dispute that § 1365(b)(1)(B) provides an unconditional right to intervene, and case law appears to support the proposition that an unconditional right is provided. *See, Ohio v. Callaway,* 497 F.2d 1235, 1242 (6th Cir.1974); *United States v. Ketchikan Pulp Co.,* 74 F.R.D. 104 (D.Alaska 1977).

On January 20, 1988, a hearing was held on these motions. This hearing provided helpful argument from counsel, but it also raised the spectre that intervention would have a far-reaching effect on the future course of this project, not limited to the siting of the outfall. The movants asserted their intention to participate as full parties, albeit in a limited fashion, in other issues, long-settled among the present parties, including proposals for providing secondary treatment and issues regarding toxicity levels. Although the participation by these parties would be a welcome addition to the array of viewpoints that must converge in shaping a workable solution to the pervasive problem of sewage disposal, I conclude that, on the record of this case, the putative intervenors are both too late and too early. They are too late to assert a right to participate generally in many aspects of this case that may have some bearing on the future of the Massachusetts Bay generally and, therefore, are untimely under Rule 24(a)(1). They are too early to claim a right to seek enforcement of effluent standards pertaining to the Bay outfall, assuming the petitions are properly brought under the statute.

## II.

■ The analysis of the instant petitions must start with a close examination of § 1365 of the statute. Under that section, Congress expressly authorized citizens to bring suit for two specific purposes. First, a citizen may sue "any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator [of the EPA] or a State with respect to such standard or limitation." 33 U.S.C. § 1365(a)(1). Second, a citizen may initiate suit "against the Administrator where there is alleged a failure of the Administra-

tor to perform any act or duty under this chapter which is to be discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). The term "effluent ... limitation" used in § 1365(a)(1) is defined as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean...." 33 U.S.C. § 1362(11). In any action commenced in a court of the United States to require compliance with a standard, any citizen may intervene as a matter of right. § 1365(b)(1)(B).

The purpose of providing these rights to citizens was to ensure that the regulations on effluent discharges promulgated under the FWPCA were enforced, if not by government action, then by citizens suits. *See* Student Comments, "The Federal Water Pollution Control Act Amendments of 1972", 14 *B.C.Indus. & Comm.L.Rev.* 672, 709 (1973) ("In response to the argument advanced by environmentalists that '[i]t is only with the public acting as a watch dog that the law will be fully enforced,' Congress included in the 1972 Amendments a provision for citizen suits to abate violations") (footnotes omitted); *see also* 118 *Cong.Rec.* H33752 (daily ed. October 4, 1972) (Highlights of House–Senate Conference Report, submitted by Rep. Jones) ("The Conference agreement provides for citizen suits against the government or a private interest for violation ... of the law"); 118 *Cong.Rec.* S33717 (daily ed. October 4, 1972) (comments of Sen. Bayh) ("I believe that the conference provision will not prevent any person or group with a legitimate concern about water quality from bringing suit against those who violate the act or a permit ... These sorts of citizen suits ... are a very useful additional tool in enforcing environmental protection laws"); Senate Public Works Comm., *Federal Water Pollution Control Act Amendments of 1972,* S.Rep. No. 92–414, 92nd Cong., 2nd Sess., *reprinted in* 1972 *U.S.Code Cong. & Admin.News* pp. 3668, 3745 ("The Committee has established a

provision in the bill that would provide citizen participation in the enforcement of control requirements and regulations established under this Act ...". As evidenced above, there was much discussion in the Committee hearings and on the floor of the House and the Senate as to the extent and contours of the right thus given to citizens. As one commentator explained, "[s]trong opposition was expressed to such a provision on the grounds that sufficient private remedies existed. Moreover, opponents of private actions predicted that allowance of citizen suits would result in a multiplicity of actions and crowded court calendars. Advocates of citizen suits, on the other hand, responded that frivolous actions could not be brought because environmental actions are generally complex and costly." "Federal Water Pollution Amendments," 14 *B.C.Indus. & Comm.L.Rev.* at 709 (citations omitted).

In contrast, there was virtually no discussion of the standards for *intervening* in an action, as codified in § 1365(b)(1)(B). Indeed, although the Senate bill was ultimately passed, the provision on intervention came from the House bill. The Report of the House Public Works Committee on this section of the bill sheds some light on the intention of the drafters. While impressed with "the intensity of feeling generated by the apparent growing reliance on legal actions as a means of controlling pollution and environmental problems" by concerned members of the citizenry, and while "appreciat[ing] the growing awareness of [citizens'] rights to utilize the courts," the Committee nevertheless expressed "concern[] that this movement to the courts may have been brought about by inadequate recognition on the part of the administrative agencies as to the proper role of the public." House Public Works Comm., *Federal Water Pollution Control Act Amendments of 1972,* H.Rep. No. 92–911, 92nd Cong., 2nd Sess., 132, 1972 U.S.Code Cong. & Admin.News p. 3668.

The Committee thus put in the bill several steps "to restore the public's confidence and to open wide the opportunities for the public to participate in a meaningful way in the decisions of government." *Id.* The last of these steps was to provide for citizen suits. With respect to intervention, the Committee wrote that, in cases where a citizen suit to abate a violation of an effluent limitation is unnecessary because the Federal or State Government had already initiated such a suit, a citizen "cannot commence[]" a suit "but any citizen may intervene as a matter of right." *Id.* at 133. It thus follows from the language of the statute, from the extensive discussion in the history of the need to carefully tailor the right of citizens to sue under the Act, and from the reasoning of the House Committee, that the right to intervene under § 1365(b)(1)(B) is coextensive with the right to initiate suit pursuant to § 1365(b)(1)(A); that is, that the right to intervene in an action is no greater than the right to initiate a suit in the first place. Thus, although it is true, as the prospective intervenors point out, that the *right* to intervene as it is expressed in the statute is unconditional, it does not follow that the *purposes* motivating that intervention are similarly unconstrained. Surely Congress did not mean to create without any discussion a right to intervene that is more extensive than the one right, the right to initiate suit, that was extensively debated and discussed and finally adopted in the statute. In short, the statute unconditionally allows intervention, but only in cases where enforcement of an effluent standard or order respecting such a standard is at issue.

The two cases principally relied upon by the petitioners do not conflict with this interpretation of the statute. The movants have argued, and the opponents to the motion have not contested, that the right to intervene itself is "unconditional" as that term is used under Rule 24(a)(1), and have cited *Ohio v. Callaway,* 497 F.2d 1235 (6th Cir.1974) and *United States v. Ketchikan Pulp Co.,* 74 F.R.D. 104 (D.Alaska 1977). Neither of those cases, however, states that an intervenor can intervene with respect to *any* issue present in the main case. In *Ketchikan,* the court interpreted that term "unconditional" strictly, ruling that there are no preconditions that a would-be intervenor must fulfill, such as exhaustion

of administrative remedies, prior to moving to intervene in a case involving "the effluent discharge requirements" of the FWPCA. 74 F.R.D. at 105. In *Callaway*, the state of Ohio had sued the Army Corps of Engineers to enjoin the construction of two reservoirs, arguing, *inter alia*, that "the challenged projects would violate water quality standards imposed by the Federal Water Pollution Control Act Amendment of 1972." 497 F.2d at 1242. The district court denied the intervention motions of three interested parties because "any discussion of a reservoir not already in existence, and therefore not able to meet any existing Ohio water quality control standards, is at best speculative." *Id.* at 1241–42. In reversing, the Court of Appeals held that the right to intervene with respect to enforcement of effluent standards under the Act was properly invoked because the violations were not speculative. "Moreover, we are reluctant to prohibit persons from challenging *expected violations* of water quality standards until reservoirs are actually constructed *if it is alleged that the present plan for construction will necessarily cause such a violation.*" *Id.* at 1242 (emphasis added).

With this analysis in mind, intervention is appropriate when effluent limitations are at issue. However, effluent limitations are no longer at issue. The liability phase of this case has long been over; this Court found effluent limitations were violated in 1985. It is not the existence of a violation that is currently the issue here, but the methods to be used to correct it. The issue then becomes one of timing—are the motions for intervention timely under Rule 24? Or, to put it another way, are the issues concerning enforcement of effluent standards closely enough related to the instant motions so as to justify intervention at this time?

There are thus two critical points in defining the "interest" upon which intervention is sought. The first is the initial violation of the effluent standards that lies at the base of the original action. If the movants had a cognizable interest in enforcing that standard, it accrued in 1985 when the suit was filed, or even earlier.

The second critical point, relied upon to justify intervention, relates to the proposed siting of the outfall in Massachusetts Bay. For this point to be relevant under the FWPCA, a clear connection must be drawn between the placement of the outfall and a *violation* of an effluent regulation enforceable under the statute. This conclusion flows naturally both from the language and legislative history of the FWPCA as well as from the cases relied upon by the movants. As was made clear in *Callaway*, where violation of an effluent standard is *not speculative*, indeed, where they are "expected" and will "necessarily" be caused by future actions, intervention should not be denied lightly. 497 F.2d at 1242.

No such clear connection—indeed, no connection at all—has been drawn between the proposed siting of the outfall and violation of water quality standards so as to justify intervention at this time. Indeed, it is because of past violations that steps are now being taken to create a new system, including a new outfall. The standard presently in place under the current NPDES permit may not govern the effluent from the outfall. The statute requires a standard for every "point source." 33 U.S.C. § 1362(11). Until the outfall is finally sited and a standard imposed which is threatened by the development of a sewage system which includes the outfall, the only prerequisite to maintaining an intervention motion has not been met.

### III.

The above is not the only ground for denying the petitions at this time. Even if some sort of violation of effluent standards occurs in the future with the siting of the outfall, I nevertheless find that the motion is untimely. As I mentioned at the outset, the petitioners are either too late to assert a generalized right to participate in this case, or too early to contend that they should be allowed into the case on the specific issue of pollution that may be caused by the outfall.

The timeliness of these petitions is governed by *NAACP v. New York*, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973) ("[t]imeliness is to be determined from all the circumstances. And it is to be determined by the court in the exercise of its sound discretion") (footnote omitted). In the First Circuit, four factors have emerged against which timeliness should be measured: first, the length of time the prospective intervenor knew or reasonably should have known of its interest before it petitioned to intervene; second, the prejudice to existing parties because of the delay in proffering the intervention petition; third, the prejudice the putative intervenor would suffer if the petition is denied; and, fourth, the existence of any unusual circumstances that militate either in support or against intervention. *Culbreath v. Dukakis*, 630 F.2d 15, 20–25 (1st Cir.1980). In applying this test, it is important to bear in mind that courts have been more lenient in allowing intervention in cases where intervention is as of right, as opposed to permissive, because of a concern that the interests of the would-be intervenors might be harmed. *See, e.g. United States v. Oregon*, 745 F.2d 550, 552 (9th Cir.1984) (intervenors as of right should be treated more leniently because of "the likelihood of more serious harm" than in cases of permissive intervention). *See also* C. Wright, A. Miller, M. Kane, 7C *Fed.Prac. and Proc.* § 1916 (1986).

The first factor in the First Circuit's *Culbreath* test for timeliness is the length of time the prospective intervenor knew or reasonably should have known of its interest, before moving to intervene. As discussed above, it had been obvious since the inception of the MWRA in 1985 that one solution to the disposal problem was the construction of an outfall somewhere in the Massachusetts Bay. The petitioners contend, however, that it was not until the spring of 1987 that they discovered that MWRA was considering sites that could adversely affect their interests. As Nahant SWIM argues, although it may have been clear in 1986 that an outfall could be located in the Bay, it was not clear that intervention was necessary at that time.

Apparently this notion was based, at least in part, on the fact that EPA had denied MDC's request for a waiver of secondary treatment requirements under § 301(h) of the FWPCA, and the supposition by Nahant SWIM that EPA's decision to reject an outfall located 9.2 miles to the east northeast of Deer Island, about 5.8 miles from Nahant, meant that no outfall closer to Nahant's shores would be allowed by EPA. It was only when *both* sets of movants found out that no site *further away* than the rejected § 301(h) site would be considered did it appear that their interests were sufficiently implicated. Similarly, the South Shore Towns argue that they did not realize they had a unique interest in this decision until the spring of 1987, when they were made aware that a site near their shores was under consideration, a fact MWRA did not discuss formally with them until that summer.

Despite the apparent surprise of MWRA's consideration of a Bay siting for the outfall, both parties seem to admit that their interest in ensuring that effluent standards concerning ocean dumping were enforced with regard to the Bay, existed *prior* to their discovery that sites near their shores were being explored. *See* Affidavit of John Silva, par. 14. As the South Shore Towns argued, "[n]o matter where the MWRA locates the terminus of the outfall pipe, tides and currents will disperse the effluent throughout Massachusetts Bay and this will have a negative impact on the water quality of the oceanfront beaches along the South Shore." Memorandum of Law in Support of the Joint Motion for Leave to Intervene of the Towns of Hull, Cohasset, Scituate, Marshfield and Hingham, at 4. The submissions of Nahant SWIM also suggest that it had had earlier notice of its interest than the latter half of 1987. *See* Memorandum of Nahant SWIM Incorporated in Support of Its Motion for Leave to Intervene, at 4 ("it has not been clear that the interests of SWIM were threatened until the Scheduling Order [of May 8, 1986] was issued and its implications were elaborated and analyzed"). The statements above suggest

that the putative intervenors may have become aware of their interest in *siting* of a sewage outfall—an interest not directly recognized under the FWPCA—in the spring of 1987, but may have been aware of their more generalized interest in *enforcing effluent standards*—the only interest recognized under the statute—prior to that time. Since it is only that latter interest that is relevant here, it appears that the movants were aware of their concern with the water quality of the Bay, and with any effluent standards designed to protect the purity of that water, well before the MWRA began to openly consider *placement* of the sewage outfall in 1986, and, arguably, as far back as June of 1985, when the prospect of siting an outfall in the Bay was widely discussed prior to the filing of the scheduling order. Thus, the movants fail to fulfill the first factor of the *Culbreath* test.

The second factor in the *Culbreath* test, prejudice to existing parties, is difficult to evaluate because of some confusion on the part of the movants with respect to the intended scope of their participation. As the Court in *natural Resources Defense Council v. Costle,* 561 F.2d 904, 908 (D.C. Cir.1977) noted, intervention which is solely prspective does not prejudice the current parties; " 'this limited goal' of future participation 'does not appear to impose any untoward burden' on the original parties where ... questions may arise about the proper working of the settlement agreement, with possible benefit to the court from appellants' participation in their resolution." 561 F.2d at 908, *quoting Hodgson v. United Mine Workers of America,* 473 F.2d 118, 129 (D.C.Cir.1972). Under this analysis, the intervention of Nahant SWIM and the South Shore Towns with respect to future decisions concerning effluent limitations concerning the outfall would not necessarily prejudice the interests of the current parties, and would fall within the reach of the statute. However, while both parties have assured this Court that they expect only limited participation, each of them has suggested in their statements to

this Court that they expect to play a somewhat expansive role. Nahant SWIM stated directly that they "may request re-examination" of milestones erected under the Scheduling Order that requires construction of the outfall by 1994. Reply Memorandum of Nahant SWIM Incorporated In Support of Its Motion for Leave to Intervene, at 6. Nahant SWIM added that "no restrictions should be placed on the issues which Nahant SWIM may address. As discussed above, the siting and use of the outfall is only one of the great number of issues affected by the case. Nahant SWIM, like every other party to this case, should be allowed to determine when its interests could be adversely affected." *Id.* at 8. SWIM alludes to projects affecting it directly, *e.g.,* staging facilities in Lynn Harbor, a dewatering study using Lynn Harbor, and the possible sludge incineration at the plant located in nearby Saugus.

Although the South Shore Towns attempted to distinguish themselves from Nahant SWIM on this point, pledging that they will not reopen settled issues, Reply Memorandum of the South Shore Towns in Support of Their Joint Motion for Leave to Intervene, at 10, they nevertheless simultaneously contend that their intervention should not be limited to just those issues concerned with the outfall, since they are also interested in other issues that may have some effect on the quality of the effluent. They cite the enormous growth in commercial, residential and recreational areas in the Towns in recent years. Although effluent quality is a proper area of concern for an intervenor under the FWPCA, the question of how far back that interest extends into other areas is problemmatic; the South Shore Towns indicate that they are interested in such settled issues as "the construction schedule for the secondary plant and the procedures used to pretreat sewage," Reply Memorandum of the South Shore Towns, at 12, and seem to be getting at settled issues through the back door. Participation on these issues is clearly *not* prospective only.[1] Any attempt

---

1. Additionally, as the MDC points out, at least with respect to Nahant SWIM, the real basis of

the movants' complaint is with the schedule that has shaped those plans regarding the outfall,

to relitigate decided issues would clearly prejudice the existing parties.

More than just statements made by the movants suggest to me that a reopening of issues is likely in this case. In other cases in this area in which intervention has been allowed at relatively late points in the litigation, the distinction between the administering of a settlement and designing that settlement was clear. For instance, in *NRDC v. Castle*, a case relied upon by the petitioners, a clear distinction existed between the making and implementing of a settlement. There the NRDC sued for declaratory and injunctive relief against the EPA with respect to regulating toxic water pollution. Various chemical and rubber companies sought to intervene in the action after settlement had been reached in which EPA agreed to establish by rulemaking a series of regulations controlling the discharge of several toxins. Intervention was allowed there because the intervenors sought only to involve themselves in the case out of a *"concern for participation in the implementation of the agreement."* 561 F.2d at 907 (emphasis in original). Similarly, in *Hodgson*, the post-liability phase of the case was distinct enough from the liability phase as to make realistic "the proposed intervenors[ ] express[ ] disavow[al] [of] any desire to reopen any previously litigated question, and [the desire to seek] only to participate in the remedial, and if necessary, appellate, phases of the case." 473 F.2d at 129. *See also United States v. Oregon*, 745 F.2d at 552 (intervention allowed in long-standing case where intervenor agreed not to relitigate settled matters and because settlement plan was about to be changed, indicating to the court

that the litigation was "entering a new phase").

In the instant case, however, the scheduling order drafted after the finding of liability against the defendants is one premised upon a specific conception of the future of what the water treatment system will be like for the eastern part of Massachusetts. As such, it stands as this Court's order, but is also vulnerable to a wide variety of interests that, if allowed to affect the plans embodied in the schedule, would serve to upset the order and cause more delays in implementation of the plans. Allowing intervention, even if limited to the specific issue of the outfall, necessarily brings with it the risk that other, settled issues—such as the plans for secondary treatment— would also be implicated, due to the rather unique posture of this case. It thus appears to me that prejudice in the form of a partial rewriting of the plans long since established by the parties may very well result from intervention on this seemingly discrete issue.[2]

Under the third factor of the *Culbreath* test, the prejudice to the would-be intervenors must also be examined. The South Shore Towns argue that if not allowed to intervene,

> they will have no means by which they can protect their interest in an unpolluted coast. . . . Once the MWRA makes the *basic decisions as to the construction of the treatment plant and its outfall pipe*, the process will be too far advanced for any aggrieved party to alter *these* decisions. This litigation is the only opportunity for the South Shore Towns to protect their interests by participating in these decisions.

indicating to MDC that Nahant SWIM will want to re-open the issue of the schedule so as to pursue their interests with respect to the outfall more effectively. Opposition of MDC and Commonwealth to Motions of Nahant SWIM and South Shore Communities to Intervene, at 6. Although the intervenors contend that this issue is of little moment since MWRA is planning an updated schedule, thus allowing, so goes the argument, for input from the intervenors that would not be disruptive, I have not indicated that any schedule tendered to me in lieu of the existing one would be accepted. Indeed, on the day that I heard argument on these motions, I

also heard argument on assessing sanctions against MWRA for failing to meet the established schedule.

2. MWRA and MDC also argue, in opposition to the intervention motions, that prejudice to their interests will result because, *inter alia*, an increase in the number of parties will make negotiations and the provision of notices and filings to all the parties overly cumbersome. Under the facts of this case, I give this argument no weight.

Memorandum of Law in Support of the Joint Motion for Leave to Intervene of the Towns of Hull, Cohasset, Scituate, Marshfield and Hingham, at 10–11 (emphasis added).

Their case is overstated, both as to the potential impact of construction and the alternatives available to the towns. First, it is not at all clear that the construction of the treatment plant and outfall pipe will *necessarily* result in violation of *any* effluent standard. Without such a showing by the Towns, they have no *right* to intervene in this action. Secondly, and related to this first point, the Towns' assertion that there are no other avenues for influencing decisions with respect to the clean-up both misstates the role of this Court under the FWPCA and misunderstands the process in which this litigation is playing only a supporting role.

As argued extensively *supra,* the movants have misread the FWPCA's invitation to citizens to intervene to help enforce effluent limitations, and have converted it into an invitation to intervene generally in the case as a whole. The substantive decisions in this case, the actual planning of the new treatment system, is not and has not been the task of this Court, it has been the job of the litigants. This Court will oversee the project and insure the parties' compliance with the order to clean up the harbor according to the timetable ordered in May, 1986. The substantive decisions are not made by the Court in this action, as the movants suggest, but by the parties in political and administrative fora open to the influence of the petitioners.

Congress established in the FWPCA a careful balance among the participants in the statutes' enforcement mechanism. Citizen participation in enforcement was supposed to dovetail with the administrative creation of identifiable standards that could effectively be evaluated by courts in hearing the suits brought by citizens. Senate Public Works Comm., *Federal Water Pollution Control Act Amendments of 1972,* S.Rep. No. 92–414, 92nd Cong., 2nd Sess. (1972), *reprinted in* 1972 *U.S.Code Cong. & Ad.News* pp. 3668, 3746 ("the participation of citizens in the courts seeking enforcement of water pollution control requirements should not result in inconsistent policy" with that of administrative agencies charged with enforcement of the measure since the standards to be followed would have been set by the agencies); *id.* at 3747 ("The citizen suit provision is consistent with principles underlying the Federal Water Pollution Control Act, that is [,] the development of clear and identifiable requirements ... [*The*] [*a*]*uthority granted to citizens to bring enforcement actions under this section is limited to effluent standards or limitations established administratively under the Act*") (emphasis added); *id.* at 3745 ("Section 505 would not substitute a 'common law' or court developed definition of water quality ... These matters will have been settled in the administrative procedure leading to the establishment of [an] effluent control provision").

Thus, participation by citizens concerning effluent standards represented a limited step toward an opening of the enforcement process under the FWPCA to citizens, and was not designed to allow them to affect policy choices made by administrative agencies or others. *See Commonwealth of Massachusetts v. United States Veterans Administration,* 541 F.2d 119, 121 (1st Cir. 1976) ("[t]he citizens' suit provisions under the FWPCA were designed to *supplement* and *expedite administrative action* to abate violations of the Act. Recourse to the courts is appropriate only when the administrative action taken is less than adequate") (emphasis added) (citations omitted); *Save Our Sound Fisheries Assoc. v. Callaway,* 429 F.Supp. 1136, 1142–43 (R.I. 1977) ("Two major Congressional concerns regarding citizen suits stand out from the legislative history of §§ 1365 and 1415(g). First, Congress thought it vital to *supplement* administrative enforcement of the statutes with enforcement by citizen suits. Second, Congress put *strong reliance on administrative enforcement,* generally allowing citizen enforcement only after the Administrator had an opportunity to bring his powers of enforcement to bear on the polluter") (emphasis added) (footnote omit-

ted). Nor did the drafters of the Act intend to allow citizens to draw the courts further into the political aspects of responding to the problem of water pollution; the role of the judiciary was limited to enforcement of specific water pollution standards, and does not include a power to alter, limit or shape the decisions made to comply with these restrictions. Thus, to the extent that the movants claim prejudice because they cannot affect the larger issues concerned with cleaning up the harbor in this litigation, I find that their complaint is really with the statute governing this area of the law, and not with its application in this specific case. Although the South Shore Towns seem to argue that participation at the administrative and political level is inefficacious, somehow justifying a claim to intervene, I find that the statute does not provide them—or this Court—with any other option.

As to the last factor in the *Culbreath* test, the unusual circumstances that may be present, I find that the magnitude of this case, and the importance in bringing the pollution of the harbor under meaningful control as soon as possible, exhorts this Court to weigh very carefully any attempt to change the nature and course of the litigation. I believe the introduction of new parties into this case at this time will fundamentally change the dynamics of the processes at work in this case.[3]

### IV.

It is important to note that this decision to deny the motions to intervene is not inconsistent with the previous ruling of this Court to allow the City of Quincy and the Town of Winthrop to intervene near the outset of the case. Two factors stand out that effectively distinguish these two parties from the movants in the instant case. First, Quincy and Winthrop are both harbor communities which have been particularly affected by the pollution of the harbor. Second, each of these communities

moved for intervention very early in the litigation (indeed, Quincy was the plaintiff in the original state court action to abate the pollution). Winthrop, as shown above, demonstrated its awareness and concern with the quality of water standards in the Bay early in this litigation. The interests of Quincy and Winthrop were therefore real and existent, and their efforts to involve themselves in this case came at an appropriately early point in the litigation.

### V.

For the foregoing reasons, the motions to intervene are denied. Any argument premised on any other subsection of Rule 24 to support the motion is also denied.

SO ORDERED.

---

3. A further implied, if not express, argument of the South Shore Towns is that Winthrop's and Quincy's immediate concern with their own parochial interests would cause them to sacrifice the Bay to the Harbor cleanup. The argumen* ignores Winthrop's coastline on the Bay and assumes a clean Harbor could remain clean with a polluted Bay. This is not a project to transfer the pollution from the Harbor to the Bay.