UNITED STATES of America, Plaintiff,

v.

METROPOLITAN DISTRICT
COMMISSION, et al.,
Defendants,

CONSERVATION LAW FOUNDATION
OF NEW ENGLAND, INC.,
Plaintiff,

v.

METROPOLITAN DISTRICT
COMMISSION, et al.,
Defendants.

Civ. A. Nos. 83–0489–MA, 83–1614–MA.

United States District Court,
D. Massachusetts.

Feb. 19, 1993.

George B. Henderson, U.S. Atty.'s Office, Boston, MA, Elizabeth Yu, Environ. Enforcement Section, Land and Nat. Resources Div., U.S. Dept. of Justice, Washington, DC, Jeffrey Fowley, E.P.A., Boston, MA, Lawrence Liebesman, U.S. Dept. of Justice, Environmental Defense Section, Gail Cooper, E.P.A.,

Joseph McGovern, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, for U.S.

Douglas Wilkins, Office of the Atty. Gen., Criminal Bureau, Boston, MA, for defendant Com. of Mass.

John M. Stevens, Foley, Hoag & Eliot, Stephen Goldberg, Virginia S. Renick, Marilyn L. Hotch, Mass. Water Resources Authority, Boston, MA, for defendant Water Resources Authority of Mass.

Thomas O. Bean, Atty. Gen.'s Office, Boston, MA, for defendant Dept. of Metropolitan Dist. Com'n.

Laura Steinberg, Sullivan & Worcester, Boston, MA, for defendant Water & Sewer Com'n of Boston.

Harlan M. Doliner, Goldstein & Manello, Boston, MA, for defendant Town of Winthrop.

Samuel Hoar, Jeffrey C. Bates, Goodwin, Procter & Hoar, Peter Shelley, Conservation Law Foundation, Boston, MA, for defendant Conservation Law Foundation.

Chester A. Janiak, Burns & Levinson, Boston, MA, for intervenor-defendant Robert C. Rufo.

Christopher Little, Tillinghast, Collins & Grahams, Providence, RI, John W. Giorgio, Kopelman & Paige, Boston, MA, Stephen D. Anderson, Arthur P. Kreiger, Anderson & Kreiger, Cambridge, MA, for Town of Walpole and Town of Norfolk.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This matter is before me on the motion of the Massachusetts Association of Sewage Pumping Contractors ("MASPC") to intervene. The basis of the motion is an order entered by this Court on May 8, 1992, which, among other steps, required the Massachusetts Water Resources Authority ("MWRA") to prepare and submit a plan for the management of septage and the control of septage disposal as part of the Boston Harbor cleanup project. MASPC seeks intervention, as of right pursuant to Fed.R.Civ.P. 24(a)(1) or 24(a)(2), or permissive intervention pursuant

to Fed.R.Civ.P. 24(b), in order to comment on the plan and to compel certain other steps which it contends are necessary to protect its members from civil and criminal liability.[1] The proposed intervention is opposed by both the MWRA and the United States. The background to this motion follows.

An important part of the Boston Harbor clean-up project is industrial pretreatment as a means of keeping toxic components of industrial waste water out of the MWRA's sewage system. The Environmental Protection Agency (EPA), recognizing on a national level that many industries were not in compliance with pretreatment standards, sought to require the MWRA to upgrade its toxic reduction program. The MWRA, though well aware of the problem, and though it had been pursuing industrial pretreatment through its Toxic Reduction and Control Department, agreed. On April 22, 1992, the EPA and MWRA submitted a joint motion regarding the MWRA industrial pretreatment to this court. The motion called for an order requiring a series of milestones relating to toxic reduction. One of the milestones concerned septage management. I entered an order to that effect on May 8, 1992 (Order). Under the Order, the plan that deals with septage management was timely filed in December, 1992 and it is to the development of that plan and its implementation that intervention is aimed.

Septage is domestic wastewater that is not directly connected to a sewer system. It is accumulated in receptacles from which it is pumped out and transported to a designated site. From the designated site it is discharged into a sewer, eventually ending up in a sewage treatment plant. The treatment plant's ability to meet water quality standards established under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, is affected by the toxic content of the wastewater it receives. Septage from non-residential or industrial sources which are likely to contain toxins cannot be discharged into the sewer system without a permit. Adequate regulation of septage management and disposal is needed to ensure that septage discharges come only from residential or other permitted sources. With proper regulation, all unpermitted hazardous and industrial wastes would be excluded from the sewer system.

The septage management plan submitted by the MWRA to the EPA, pursuant to the Order, has two parts. The first part deals with the permitting of septage haulers by the MWRA. Permitting will assure that haulers know what they can and cannot discharge to the sewer system, and requires also that the haulers document the sources and make that documentation available to the MWRA for enforcement purposes. The plan calls for all septage haulers to be permitted by June, 1993.

The second part of the plan calls for the development of regional sites to replace existing sites. MASPC is concerned because they claim that there is no inter-municipal agreement for the disposal of septage and, therefore, its members, by transporting septage from one community to another, may violate regulations promulgated by the Department of Environmental Protection ("DEP").

Of additional concern to MASPC is the historically irregular manner by which local communities have managed septage disposal sites and the MWRA has enforced septage disposal regulations. The basis for MASPC's concerns is a study commissioned by the MWRA, the Weston and Sampson study. That study found that disposal sites were inconsistently operated, and subject to a variety of inconsistent disposal options, local management practices, and fees. The study also found that the communities were not adequately policed by the DEP and lacked the interest and financial resources to manage disposal sites properly. As a result, waste, such as oil and grease from non-residential sources is often mixed with domestic septage and discharged into the sewer system. MASPC is concerned that this maze of inconsistent municipal approaches to the problem exposes its licensed members to potential civil and criminal liability, and, at the

---

1. MASPC's members are licensed to transport and dispose of septage at the twenty disposal sites within the MWRA district.

same time, encourages the unlicensed haulers to take advantage of poorly operated disposal sites in order to dispose of non-domestic hazardous or industrial wastes. It is against this background and in light of the standards set for intervention that I examine MASPC's motion to intervene.

Fed.R.Civ.P. 24(a)(2) allows intervention of right if four conditions are met: (1) the application must be timely; (2) the intervenor must claim an interest in the transaction which is the subject of the actions; (3) disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect the interest; and (4) the applicant must show that the interest will not be adequately represented by existing parties. Failure to meet any one of these requirements precludes intervention. *Conservation Law Foundation, Inc. v. Mosbacher,* 966 F.2d 39, 41 (1st Cir.1992).

In the present case, MASPC fails to satisfy at least three of these conditions. First, MASPC has no legally sufficient interest in the current action, though it alleges two. MASPC's first purported interest is to protect its members' economic position, which the association claims has been undermined by prevailing septage management and disposal practices. MASPC complains that the present system of community-controlled septage disposal has produced inconsistency in disposal options, management practices and fees. It charges that less scrupulous septage haulers have taken advantage of poorly operated disposal sites to dump unpermitted non-domestic wastes. The association asserts that this illicit dumping has caused a Hobson's dilemma for its members: either they abstain from such illegal disposal practices and let other haulers gain significant competitive advantages, or they participate and subject themselves to civil and criminal liability. Therefore, MASPC claims that its members have an important economic interest in assuring that the MWRA's septage disposal plan produces a system that is

well managed and regulations that are strictly enforced.[2]

As the United States points out in opposition to intervention, this Court's Order will not adversely affect the economic interests of MASPC's members. *Opposition Memorandum,* at 7 and note 3. On the contrary, whatever impact the new septage disposal plan has, it should benefit them. The plan, as negotiated between the United States and the MWRA, envisions licensing all septage haulers and regionalizing the septage disposal sites. These actions should make it easier to control and oversee septage disposal in the MWRA area and ensure that disposal takes place in compliance with MWRA regulations. By reducing the number of disposal sites and increasing the resources at each one to supervise disposal, the intended reforms should close disposal loopholes that have in the past given some haulers an unfair business advantage over their more honest competition. Therefore, because of the salutary impact the septage reforms should have on MASPC members, I find that the association does not have an economic interest in intervening.

Beyond business considerations, MASPC also asserts an interest in the development of a proper septage disposal system. *Revised Memorandum,* at 23. It claims that its corporate purpose is to promote "suitable and legal" disposal sites. *Id.* To have an interest that justifies intervention, however, that interest must be directly, not tangentially, related to the subject matter of the lawsuit. *See Conservation Law Foundation, Inc. v. Mosbacher,* 966 F.2d 39, 42. The central purpose of the present litigation is to ensure that the MWRA complies with the Clean Water Act. Without doubt, there are constituent, environmental purposes, one of which is the implementation of an appropriate plan for septage disposal. Nevertheless, an interest must be measured in relation to the real focus of the litigation. Here, that focus is enhancing the quality of certain waters. MASPC's interest in promoting a "suitable" septage disposal system bears only

---

2. MASPC wants the court to order the MWRA to assume control of the management of all septage disposal sites in the MWRA district. Based on the Weston and Sampson study, it argues that the current disposal site communities lack the interest and financial resources to manage the sites properly.

an oblique relation to the present legal action. Therefore, I find that MASPC lacks the necessary interest in the subject of the litigation to justify intervention under Rule 24(a)(2).

■ Even if MASPC's interest in the creation of a proper septage disposal system constituted an adequate, environmental interest in this lawsuit, MASPC still would not be entitled to intervene. The United States and the Conservation Law Foundation ("CLF"), who originally brought this action, have been unfailingly vigilant in their efforts to ensure MWRA compliance with the requirements of the Clean Water Act. The MWRA, too, has shown its own determination to comply with federal clean water standards. I find, therefore, that any environmental interest MASPC might have in bringing the MWRA into compliance is adequately represented by the existing parties to the lawsuit.

Furthermore, disposition of the present action, by allowing the United States and MWRA to proceed to implement their septage disposal plan, will not impair or impede MASPC's ability to protect its own interests. The crux of MASPC's complaint is against the State of Massachusetts and its environmental agencies, the MWRA and the DEP. MASPC charges that these agencies have failed to enforce existing septage disposal regulations adequately. Consequently, the appropriate forum for relief for MASPC is in the state's courts and with its administrative agencies.[3] Moreover, because MASPC has no legal claim implicating federal law, it has no right to a federal forum.[4] Therefore, MASPC will not be prejudiced if it cannot intervene in this federal litigation.

Lastly, Rule 24(a)(2) calls for a consideration of the timeliness of MASPC's intervention motion. On its face, it appears to be a close question. Nevertheless, I decline to analyze the point further, because the other three factors under Rule 24(a)(2) are dispositive and dictate against intervention. The question of timeliness is, therefore, moot. Thus, I conclude that MASPC is not entitled to intervene under Rule 24(a)(2).

■ MASPC also claims the right to intervene pursuant to Fed.R.Civ.P. 24(a)(1). Under Rule 24(a)(1), one is entitled to intervene when a federal statute provides an unconditional right to do so. MASPC claims such a right to intervene under Section 505 of the Clean Water Act.[5] 33 U.S.C. § 1365. Under Section 505, a citizen has an unconditional right to intervene in a case where there is a "clear connection" between proposed action by the existing parties and violations of water quality standards enforceable under the Clean Water Act. *See United States v. Metropolitan Dist. Comm'n,* 679 F.Supp. 1154, 1159 (D.Mass.1988).

To prove there is such a clear connection in this case between the septage disposal plan and foreseeable violations of water quality standards, MASPC relies exclusively on the findings of the Weston and Sampson study. Though the study notes that the unlawful discharge of non-domestic grease and oil into the sewer system may pose a potential water quality problem, it does not go further to conclude that this practice has, in fact, reduced water quality below required federal standards. Without more, MASPC cannot claim that the septage reform plan will clearly breach the integrity of water quality in the MWRA district. If anything, the plan should have the opposite effect and safeguard water quality. Without showing that septage reform will cause water quality

---

**3.** One remedial avenue available, recognized by MASPC in its own brief, would be mandamus actions against the present disposal site municipalities to require their compliance with existing disposal management regulations. *See Revised Memorandum,* at 11.

**4.** MASPC has not adduced any evidenced of septage discharge violations that have caused a violation of federal water quality standards. At most, MASPC has only repeated the discovery of the MWRA-commissioned study that the discharge of non-domestic oil and grease into the sewer system *may* pose a potential pollutant

problem. Without more, MASPC has no basis for bringing an action in federal court under the Clean Water Act.

**5.** Section 505 provides that:
any citizen may commence a civil action on his own behalf ... against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of ... an effluent standard or limitation under this chapter....
*33 U.S.C. § 1365.*

to deteriorate, MASPC cannot claim, under Section 505, an unconditional right to intervene in this case.

 In addition, as a corporation, whose corporate purpose does not include protecting water quality, MASPC has no standing to sue on behalf of its members under Section 505.[6] An organization has standing to sue in a representative capacity for its members if: (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir.1992).

In this case, MASPC's claim to standing fails to satisfy the second prong of the associational standing test. The interests of protecting water quality are not germane to MASPC's corporate purposes, none of which addresses the promotion of water quality. MASPC, therefore, cannot qualify as a citizen for purposes of the citizen standing rule under Section 505. Consequently, MASPC is not entitled to intervene under Rule 24(a)(1).

Barring an unconditional right to intervene, MASPC argues that this court, nonetheless, should allow it to intervene under Fed.R.Civ.P. 24(b). While a court may allow intervention in certain circumstances under Rule 24(b), a court may block intervention where intervention would unduly delay or prejudice the adjudication of the original parties' rights. *See* Fed.R.Civ.P. 24(b). Most salient to the Rule 24(b) analysis here is a recognition of the importance and ambitiousness of this litigation. Its goal is nothing less than the entire clean-up of Boston Harbor. It touches hundreds of groups,

each of whom could probably claim some secondary economic or environmental impact from it. To allow MASPC to intervene would open the floodgates to innumerable others with the potential for drowning the whole project in a sea of litigation. At an earlier stage of this litigation, with respect to another intervention effort, I stated that "the magnitude of this case, and the importance in bringing the pollution of the harbor under meaningful control as soon as possible, exhorts this Court to weigh very carefully any attempt to change the nature and course of the litigation." *See United States v. Metropolitan Dist. Comm'n*, 679 F.Supp. 1154, 1164. Bearing that in mind, I find that allowing MASPC to intervene would unnecessarily change the course of this lawsuit and cause the existing parties undue delay. I, therefore, deny MASPC's motion to intervene.

SO ORDERED.

---

6. The MASPC'S Articles of Incorporation state that its corporate purposes are to:
   (a) assist communities and the public at large in becoming aware of our mutual disposal problems; (b) consult with communities as to the design and implementation of suitable and legal dumping facilities; (c) provide a forum for the discussion of problems and formulate solutions pertaining to the design, manufacture and implementation of systems for the disposal of septic wastes; (d) provide suitable communication links with agencies both public and private; (e) compile and disseminate state of art [sic] and progressive information to the industry; (f) promote better communication and cooperation within the industry. *Revised Memorandum*, at 27, note 1.