NATURAL RESOURCES DEFENSE
COUNCIL et al.

v.

Douglas M. COSTLE, as Administrator, Environmental Protection Agency, Firestone Tire and Rubber Company, et al., Appellants.

NATURAL RESOURCES DEFENSE
COUNCIL et al.

v.

Douglas M. COSTLE, as Administrator, Environmental Protection Agency, Union Carbide Corporation, et al., Appellants.

Nos. 76–1664, 76–1665.

United States Court of Appeals,
District of Columbia Circuit.

Argued 25 April 1977.

Decided 15 June 1977.

Charles F. Lettow, Washington, D.C., with whom Robert C. Barnard, Washington, D.C., was on the brief, for appellants.

Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C., with whom Peter R. Taft, Asst. Atty. Gen., Raymond N. Zagone, Thomas A. Pursley, III, Robert A. Kerry, Attys., Dept. of Justice and Ridgway M. Hall, Jr., Atty., E.P.A., Washington, D.C., were on the brief, for federal appellees.

Ronald J. Wilson, Washington, D.C., with whom J. G. Speth and Edward L. Strohbehn, Jr., Washington, D.C., were on the brief, for appellees, Natural Resources Defense Council, et al.

Richard E. Schwartz, Washington, D.C., entered an appearance for appellee, American Iron and Steel Institute.

Michael R. Berman, Chicago, Ill., entered an appearance for appellee, Citizens For a Better Environment.

Before MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This appeal arises out of a settlement agreement reached by the parties in this

case following remand from this court.[1] The settlement agreement obligates the Administrator of the Environmental Protection Agency to establish by rule-making various sets of regulations under the provisions of the Federal Water Pollution Control Act Amendments of 1972[2] relating to the discharge of named pollutants. In motions before the District Court the appellants here, assorted rubber and chemical companies, sought to intervene in this action in order to participate in the District Court proceedings involving the implementation and oversight of the settlement agreement. The District Court denied their motions for intervention. The single question presented for review is whether the appellants are entitled to intervene as of right pursuant to Rule 24(a)(2), Fed.R. Civ.P.[3] We hold that they are, reverse the District Court, and remand the case to allow intervention.

## I. BACKGROUND

This action began in 1973 with a lawsuit filed by various environmental groups [hereinafter "NRDC"][4] against the Administrator of the Environmental Protection Agency [hereinafter "EPA"] seeking declaratory and injunctive relief against EPA with respect to its duty under Section 307(a)[5] of the Federal Water Pollution Control Act Amendments of 1972 [hereinafter "the Act"] to regulate toxic discharges into American waters. The District Court dismissed the complaint. On appeal, as noted, this court reversed and remanded for additional proceedings because the District Court had acted without having the entire administrative record before it.

Following remand, the parties, NRDC and EPA, entered into private negotiations aimed at settling the case. In early March 1976 the parties gave notice that a settlement had been reached and submitted a proposed settlement agreement to the court for approval on 31 March 1976. The settlement agreement included settlement of three related cases which had been filed in the District Court,[6] which were later consolidated with the lead case. Into one of these cases, intervention by various companies and trade associations had already been granted.[7]

By the terms of the settlement, as noted, EPA is required to establish by rule-making a series of regulations relating to various named pollutants; by the agreement EPA will be promulgating these regulations under sections 301, 304 and 306 of the Act[8] as well as section 307. The agreement provides that EPA would regulate the pollutants on an industry-by-industry basis and also sets a priority and timetable for studies and rule-making. After allowing for and

1. *Natural Resources Defense Council, Inc. v. Train*, 171 U.S.App.D.C. 151, 519 F.2d 287 (1975).

2. 86 Stat. 816, 33 U.S.C. § 1251 *et seq.*

3. "(a) *Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

4. These included the Natural Resources Defense Council, Inc., the Environmental Defense Fund, Inc., the National Audubon Society, Inc., and the Businessmen for the Public Interest, Inc.

5. 33 U.S.C. § 1317(a).

6. *Environmental Defense Fund, Inc. v. Train*, Civil Action No. 75–172. *Citizens For A better Environment v. Train*, Civil Action No. 75–1698. *Natural Resources Defense Council, Inc. v. Agee*, Civil Action No. 75–1267. Nos. 75–172 & 75–1698 sought to compel EPA to comply with the timetable of section 307(a) for the regulation of toxic pollutants; No. 75–1267 sought to compel speedy promulgation of pretreatment standards under section 307(b).

7. In Civil Action No. 75–172 intervention had been allowed to the American Iron and Steel Institute, American Cyanamid Company, the National Coal Association, the American Petroleum Institute, and four of its member companies, Shell Oil Company, Standard Oil Company (Indiana), Union Oil Company and Standard Oil Company (Ohio).

8. 33 U.S.C. §§ 1311, 1314 and 1316.

receiving comments from the public on the proposed agreement, including comments from appellants, on 9 June 1976 the District Court entered an order consolidating the cases, approving the agreement and directing compliance with its terms.[9]

Appellants filed their motions for intervention in two groups and at two different times. On 29 March 1976 the first group [hereinafter "Union Carbide"][10] moved to intervene as parties defendant; according to this group, their counsel first became aware of the settlement agreement in mid-March. On 23 April 1976 the other group [hereinafter "Firestone"][11] moved to intervene as parties defendant; their contention is that they first learned of the settlement agreement when it was offered to the court on 31 March 1976. Appellants sought intervention, as noted, in order to ensure their full rights of participation in the "crucial decisions"[12] to be made before the District Court in the oversight and implementation of the agreement. By an order and memorandum of 29 April 1976 the District Court denied the motions to intervene.[13] The court ruled that the motions were not timely because of "the age of the cases, [and] the fact that they are on the verge of settlement. . . ." In addition, the court concluded that the interests of Union Carbide and Firestone would not be impaired because "no challenges to the validity of regulations formulated pursuant to it [the agreement] shall be pretermitted." Finally, the court held that the interests of Union Carbide and Firestone in the promulgation of lawful regulations would be adequately represented by EPA and the existing industry intervenors. For the reasons set out below, we consider that the District Court erred and remand for intervention by right to be allowed.

## II. TIMELINESS

Whether a motion to intervene is timely "is to be determined from all the circumstances."[14] More particularly, this court has noted:

> [T]he amount of time which has elapsed since the litigation began is not in itself the determinative test of timeliness. Rather, the court should also look to the related circumstances, including the purpose for which intervention is sought . . . and the improbability of prejudice to those already in the case. *Hodgson v. United Mine Workers of America.*[15]

Judged by these standards, it is clear that the District Court abused the "sound discretion"[16] it is accorded to assess timeliness. In relying upon the age of the case and its closeness to settlement, the Court failed to take into account "the purpose for which intervention [was] sought," namely, *the concern for participation in the implementation of the agreement.* In *Hodgson, supra,* for example, this court allowed an application for intervention *seven years* after the case was filed when, as here, the appli-

---

**9.** The order, memorandum and settlement agreement are not officially reported; they can be found at 8 E.R.C. 2120. Also joining in agreement with the settlement was the National Coal Association, an intervening party.

**10.** This group presently includes Union Carbide Corporation, FMC Corporation, The Dow Chemical Company, Celanese Corporation, Olin Corporation, E.I. duPont de Nemours and Company, Exxon Corporation, and Monsanto Company.

**11.** This group includes Firestone Tire and Rubber Company, Goodyear Tire and Rubber Company and B. F. Goodrich Company.

**12.** Firestone's Memorandum of Points and Authorities in Support of Motion . . . For Leave To Intervene; Deferred Joint Appendix (J.A.) at 168. *See also* Union Carbide's Memorandum of Points and Authorities in Support of Motion . . . For Leave To Intervene; J.A. at 91–92.

**13.** The memorandum opinion and order have not been officially reported; they are unofficially reported at 2 CCH PCG ⌐ 40,011 at 40,-097. They are reprinted at J.A. at 171. Union Carbide and Firestone each took separate appeals, which have been consolidated by this court.

**14.** *NAACP v. New York*, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973).

**15.** 153 U.S.App.D.C. 407, 418, 473 F.2d 118, 129 (1972).

**16.** *NAACP, supra* at 366, 93 S.Ct. 2591.

cant did not seek to reopen the settled issues in the case but sought to participate in an upcoming, remedial phase of the litigation. Thus, in light of appellants' purposes here, it does appear that their motions were timely, as they were presented contemporaneously with the proffering to the court of the settlement agreement.

Even if there was a delay in seeking intervention because, as appellees assert, appellants should have known much earlier from the pleadings on the public record that a settlement agreement could have been very expansive in scope, a determination of timeliness would also have to weigh, as *Hodgson* instructs, whether that delay would unfairly disadvantage the original parties. Again in light of appellants' purpose, their intervention would not have prejudiced the original parties: intervention was not sought to upset the settlement agreement but to participate in its future administration, were it to be approved. And, in the language of *Hodgson*,[17] "this limited goal" of future participation "does not appear to impose any untoward burden" on the original parties where, as shall be seen, questions may arise about the proper working of the settlement agreement, with possible benefit to the court from appellants' participation in their resolution. In short, then, as measured by the purpose of the intervention and the possible prejudice to the parties—established standards under

Rule 24—[18] the motions should have been ruled timely.

## III. IMPAIRMENT OF INTEREST

In assessing whether the denial of intervention works a practical impairment of appellants' interests, it may be helpful to focus more carefully on relevant provisions of the settlement. As noted, the agreement obligates EPA to initiate rule-making proceedings for the regulation of named pollutants;[19] the rule-making is to proceed on an industry-by-industry basis[20] with timetables and priorities set out in the agreement.[21] The regulations will be establishing effluent limitations and guidelines, new source standards of performance and pretreatment standards for each industrial category. The agreement does not provide for review or approval by the District Court of the merits of the ultimate regulations; indeed, review of the regulations promulgated is presumably vested by the Act exclusively in the courts of appeals.[22] In fact, the District Court was careful to note that its "approval of the agreement creates no precedent on the legality of the specific regulations which may emerge."[23] The agreement does set out grounds, however, for EPA to decide that it will *not* initiate rule-making with respect to particular pollutants within an industrial, or a so-called "point-source" category or subcategory.[24]

17. *Supra*, 153 U.S.App.D.C. at 418, 473 F.2d at 129.

18. *See NAACP, supra,* 413 U.S. at 365–69, 93 S.Ct. 2591. *See also* 7A Wright & Miller, *Federal Practice and Procedure,* § 1916 (1972); 3B Moore, *Federal Practice,* ⸿ 24.13[1].

19. These pollutants are listed at Appendix A of the agreement, *e. g.,* cyanides, mercury and compounds, and vinyl chloride, and number 65 in total.

20. Appendix B to the agreement sets out 21 named industrial categories, *e. g.,* timber products processing and organic chemicals manufacturing, with appropriate subcategories.

21. *Regulation is generally to proceed in the* order that the categories are listed in Appendix B; timetables are set for the letting of contracts and for the initiation and termination of rule-making. The agreement states that "final

regulations for the remaining five categories shall be promulgated not later than December 31, 1979." J.A. at 198.

22. 33 U.S.C. § 1369(b). *See American Frozen Food Institute v. Train,* 176 U.S.App.D.C. 105, 539 F.2d 107 (1976).

23. Order and Memorandum of 9 June 1976; J.A. at 187.

24. *See* ⸿ 8 of the settlement agreement; J.A. at 199–201. For example, ⸿ 8(a)(iii) allows EPA to exclude a specific pollutant from the regulation of a point-source category where "the specific pollutant is either not present in the discharge or in the effluent which is introduced into treatment works . . . or is present only in trace amounts and is neither causing, nor likely to cause, toxic effects with respect to any identifiable organisms affected or likely to be affected by such discharge or effluent."

When EPA decides upon such an exclusion, it must promptly submit a statement under oath to the parties explaining and justifying the exclusion; the parties may presumably invoke the continuing jurisdiction of the District Court to review whether the exclusion squares with the grounds of the settlement agreement.[25] Of further relevance is that the agreement requires that EPA provide the parties quarterly oral briefings on its progress and, as appropriate, documents and written materials supporting the reports.[26]

Under the terms of this settlement agreement, the District Court found that there would be no practical impairment of appellants' interest for purposes of Rule 24(a)(2). Given that their interest is in seeing that the ultimate regulations can be sustained under the Act,[27] the District Court saw the settlement as amounting to no impairment of appellants' interest because "[a]ny question as to the content of the regulations, including the adequacy of their factual predicate, can be raised once the regulations are promulgated."[28] While the possibility of future litigation remains open under the agreement, it simply cannot be said that, therefore, there is no impairment of appellants' interest in the promulgation of valid regulations. Rather, in the leading case of *Nuesse v. Camp*,[29] this court read Rule 24(a)(2) as looking to the "practical consequences" of denying intervention, even where the possibility of future challenge to the regulation remained available. Judicial review of regulations *after* promulgation may, "as a practical matter," afford much less protection than the opportunity to participate in post-settlement proceedings that seek to ensure sustainable regulations in the first place, with no need for judicial review. Aside from the time and expense of litigation as a recourse, it may be that review might be had only after final effectiveness, during a period when appellants may be subject to compliance and enforcement.

If appellants' interest in valid regulations would be more "practically" served by intervention in post-settlement proceedings, then the question arises how in particular their participation can contribute to more demonstrable protection of their interest than subsequent review. A clear illustration of the "practical" advantage of intervention involves the important decisions of the EPA, reviewable by the District Court, about which rule-makings *not* to initiate. As noted earlier, the settlement agreement authorizes EPA to exclude specific pollutants in the regulation of industrial categories. As Firestone argued before the District Court:

**25.** The District Court has affirmed that its role will be to "ensure good faith compliance with the provisions of the agreement." Order and Memorandum of 9 June 1976; J.A. at 186. Without deciding the question of its applicability to the settlement agreement, this court also notes that section 505 of the Act, 33 U.S.C. § 1365, vests the District Court with jurisdiction to compel EPA to perform any nondiscretionary act. In other words, in addition to being subject to the undertakings agreed to in the settlement, EPA is also subject in proceedings before the District Court to whatever duties may be held to be imposed pursuant to section 505 of the Act.

**26.** ⌐ 9 of the agreement; J.A. at 201.

**27.** The District Court agreed that appellants satisfied one of the conditions of Rule 24(a)(2), that is, that they properly claimed an interest in the subject of the action. "All movants," it noted, "are manufacturers who will almost certainly be affected by regulations promulgated

pursuant to the settlement agreement or associations representing such manufacturers." J.A. at 175. Moreover, as the District Court also acknowledged, appellants have been parties to challenges in other circuits to EPA regulations. As a result of this litigation, various regulations have been set aside and remanded to EPA for reconsideration and revision. *See, e. g., Union Carbide Corp. v. Train*, 541 F.2d 1171 (4th Cir. 1976) (setting aside and remanding guideline regulations and new source standards for the entire Organic Chemicals Manufacturing Point Source Category). Appellants contend that the settlement agreement in the instant case will control EPA's actions on remand in *Union Carbide Corp.*, and in other similar cases.

**28.** Memorandum of 29 April 1976; J.A. at 177.

**29.** 128 U.S.App.D.C. 172, 180, 385 F.2d 694, 702 (1967).

Unless movants are granted leave to intervene in this action, they will have no opportunity to comment upon and participate in the first step for selecting pollutant parameters [specific pollutants] to serve as the basis for the rubber industry's effluent regulations.[30]

In other words, if NRDC contests an EPA decision to exclude a specific pollutant, Firestone, without intervention, would not be entitled to participate before the District Court in its review of this crucial initial decision. If EPA's decision is not sustained, Firestone's only recourse, without intervention, would be to file comments and then litigate the regulations after promulgation. The District Court did not discuss or mention the possible impairment to appellants' interest that may ensue from their exclusion from proceedings on these key decisions on what not to regulate.

Another impairment of the appellants' interest in valid regulations arises from their exclusion from possible proceedings about modifications in the timetable. As Union Carbide argued before the District Court:

The chemical companies submit that past experience has shown that the imposition of rigid procedures and schedules upon the Administrator has resulted, despite good-faith efforts at compliance, in precipitous actions which ultimately lead to further and additional litigation to set aside regulations so developed in hurried fashion without adequate factual foundation and analysis.[31]

As with proceedings on exclusions from regulations, only parties will be entitled to participate in the deliberations before the District Court on timetable modifications. The possibility of such modifications is not only raised by past experience,[32] but was also suggested by an advisory committee that reviewed this very agreement.[33] In response to appellants' claim that it wished to intervene in the various efforts to devise workable modifications, the District Court characterized the claim as "not one of impairment, but merely of inconvenience," relying expressly upon the possibility that inadequate regulations could later be set aside. However, it is not enough to deny intervention under 24(a)(2) because applicants may vindicate their interests in some later, albeit more burdensome, litigation. This court in *Nuesse* stated that, especially in administrative law cases, questions of "convenience" are clearly relevant:

[I]n the intervention area the "interest" test is primarily a practical guide to disposing of lawsuits by involving as many

---

**30.** Firestone's Memorandum of Points and Authorities In Support of Motion . . . For Leave To Intervene As Party Defendants; J.A. at 168.

**31.** Union Carbide's Memorandum Of Points and Authorities In Support Of Motion . . . For Leave To Intervene As Parties Defendants; J.A. at 91–92. Union Carbide cited for the District Court, by way of example, the case of *duPont de Nemours & Co. v. Train*, 541 F.2d 1018 (4th Cir.), *rev'd in part and aff'd in part*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). On the merits in *duPont*, the Fourth Circuit, in an action not reviewed by the Supreme Court, found that each of the challenged water regulations lacked a factual basis, the record under the court-ordered timetable being "cryptic" and "confused" to the court. See also the result of this court's two orders spurring the EPA to action in regard to lead in gasoline, *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 442, 541 F.2d 1, 70 (*en banc*) (Wilkey, J., dissenting), *cert. den.* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

**32.** *See* n. 31 *supra*. In its Brief before this court, appellant also refers to the experience under the court-ordered timetable prescribed in *Natural Resources Defense Council, Inc. v. Train*, 6 E.R.C. 1033 (D.D.C.1973), *rev'd in part and remanded*, 166 U.S.App.D.C. 692, 510 F.2d 692 (1975). By August 1976 there had been *fourteen* separate orders modifying the initial timetable of November 1973 for the promulgation of final guideline regulations.

**33.** In an analysis of the draft agreement, the Effluent Standards and Water Quality Information Advisory Committee, an independent committee within EPA, advised it on 13 April 1976 that:

[T]he task force feels, no matter what funding level is provided, adequate supporting data cannot be obtained for all specific substances and unknown generic compounds under the schedule of the proposed agreement. J.A. at 141.

apparently concerned persons as is compatible with efficiency and due process.[34] But the District Court here made no assessment at all of the competing claims of convenience, such as whether the intervention by the concerned appellants would be compatible with the efficiency of post-settlement proceedings.[35]

Applying the *Nuesse* standard ourselves, we find that the practical accommodation would be to admit appellants as parties. As has been shown, their involvement may lessen the need for future litigation to protect their interests. The additional numbers of parties do not appear to be either unusual or unmanageable, especially given the discretion the District Court possesses to control the course of proceedings before it.[36] Finally, as Part IV will demonstrate, their admission as parties will not lead "to a cluttering of lawsuits with multitudinous *useless* intervenors," as EPA charges,[37] since the industry-intervenors have many particular, *separate* interests in the regulation of their own categories in addition to their overlapping interest in the promulgation of a body of valid regulations. Having thus identified some specific ways that ap-

pellants' interests may be impaired by exclusion,[38] we turn finally to the question of whether that possible impairment could be expected to be avoided on account of the representation of existing parties.

## IV. ADEQUACY OF REPRESENTATION BY EXISTING PARTIES

■ Rule 24(a)(2) provides that, if an applicant meets the conditions of timeliness and impairment of interest, intervention shall be permitted "unless the applicant's interest is adequately represented by existing parties." According to the Supreme Court,

> The requirement of the Rule is satisfied if the applicant shows that representation of his interest "may be" inadequate; and the burden of making that showing should be treated as minimal. *Trbovich v. United Mine Workers of America.*[39]

In our view, appellants met the "minimal burden" of showing that existing representation "may be" inadequate to protect their interest and should not have been denied intervention on this count.

---

**34.** *Supra*, 128 U.S.App.D.C. at 178, 385 F.2d at 700.

**35.** The District Court further disposed of the question of convenience as follows:

> Considerations of convenience more properly fall under Rule 24(b), and, in the instant case, are far outweighed by the willingness of the plaintiffs and defendants to settle the matter and initiate the regulatory process. J.A. at 177.

Not only did the court err, as noted, in failing to balance factors of convenience under 24(a)(2), but also its account of a balance under 24(b), which provides for permissive intervention, evidences a weighing of irrelevant factors. Its reliance upon the "willingness" of the parties to settle and to begin the process, as counting against intervention, suggests that the District Court regarded appellants' intervention as sought in order to block the settlement. (It may also be recalled the court's view of the motions as untimely because they were "on the verge of settlement.") As emphasized from the outset, however, the primary thrust of appellants' motions to intervene has been to be able to participate in the important decisions *implementing* the settlement agreement.

**36.** The District Court may, of course, bar appellants from seeking to reopen a question set-

tled by the agreement since their intervention was sought in order to participate in post-settlement implementation. As for future intervention by other parties, the District Court possesses ample discretion under 24(a)(2), guided by the standards of *Nuesse* and *Hodgson*, to see that post-settlement proceedings are workable, nonduplicative and fair.

**37.** EPA Brief at 23 (emphasis added), *quoting* Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure* (I), 81 Harv.L.Rev. 356, 403 (1967).

**38.** We repeat, in addition, that ⸀ 9 of the agreement requires EPA to provide the progress briefings and information only to parties. In light of the other impairments from denial of intervention, we need not decide whether possible exclusion under ⸀ 9 also impairs appellants' interests. Such a decision might turn, moreover, upon a more accurate understanding of what will happen at these meetings, which presently is beyond the scope of this record.

**39.** 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636, 30 L.Ed.2d 686 (1972) (citation omitted).

Nowhere mentioning the permissive standard of *Trbovich*, expressly followed by this court in *Hodgson v. United Mine Workers*,[40] the District Court found that EPA shared appellants' interests in the promulgation of lawful regulations and would adequately represent them. And, "in any event," the Court noted, the other industry intervenors possess the same interests and will also adequately represent them. First of all, as to EPA, a shared general agreement with appellants that the regulations should be lawful does not necessarily ensure agreement in all particular respects about what the law requires. Without calling the good faith of EPA into question in any way, appellants may well have honest disagreements with EPA on legal and factual matters. There may be factual disagreement, for example, on how best to modify the timetable so as to ensure an adequate factual predicate for regulation. Good faith disagreement, such as this, may understandably arise out of the differing scope of EPA and appellants' interests: EPA is broadly concerned with implementation and enforcement of the settlement agreement, appellants are more narrowly focussed on the proceedings that may affect their industries. Particular interests, then, always "*may* not coincide," *Nuesse v. Camp*,[41] thus justifying separate representation. We cannot predict now the specific instances when appellants might wish to urge before the Court a timetable different from EPA's, including conceivably a faster timetable in some instances, but, with the recognition of the clear possibility of disparate interests,

we think appellants have shown that EPA representation may not be adequate.

Even when the interests of EPA and appellants can be expected to coincide, such as on the exclusion of a specific pollutant from regulation, that does not necessarily mean that adequacy of representation is ensured for purposes of Rule 24(a)(2). For example, in the case of *N. Y. Pub. I. R. G. v. Regents*,[42] at issue was the legality of a state regulation banning the advertising of prices of prescription drugs. Although the state authority clearly shared the interest of a pharmaceutical association in sustaining the rule, intervention of right was allowed, nonetheless, for the pharmaceutical association. Despite the coincidence of interest, the Second Circuit believed that participation by the intervenor might provide a very helpful supplement to the defense by the state authority:

> [W]e are satisfied that there is a likelihood that the pharmacists will make a more vigorous presentation of the economic side of the argument than would the Regents [the state authority].[43]

We believe that the reasoning of the Second Circuit is applicable to this case. As noted, the appellants' interest is more narrow and focussed than EPA's, being concerned primarily with the regulation that affects *their* industries. Given the acknowledged impact that regulation can be expected to have upon their operations,[44] appellants' participation in defense of EPA decisions that accord with their interest may also be likely to serve as a vigorous and helpful

---

**40.** *Supra* at 130.

**41.** *Supra*, 128 U.S.App.D.C. at 181, 385 F.2d at 703 (emphasis added). With all respect to the District Court, we believe that it misread the applicability of *Nuesse* to this case. It stated that, "[t]he instant case is exactly the opposite of *Nuesse v. Camp*, where a regulatory authority was permitted to intervene because the regulated party who brought the suit had too narrow an interest to adequately represent the regulator." J.A. at 179. While the court correctly described *Nuesse*, its distinction from this case is based upon too literal an application. *The point of Nuesse is not that* intervention is only warranted when the applicant has a more general interest than the existing party,

but rather is that representation may not be adequate when the parties have *different* scopes to their interest, *i. e.*, when their "interests may not coincide."

**42.** 516 F.2d 350 (2d Cir. 1975).

**43.** *Id.* at 352. The Regents in this case did not oppose intervention because they conceded that their interests may differ from the pharmacists. Having noted in the instant case that the interests of EPA and appellants "may not coincide" in all respects either, we continue to regard *N. Y. Pub. I. R. G.* as analogous.

**44.** *See* n. 27 *supra*.

supplement to EPA's defense. Many of these decisions, after all, turn on questions of very technical detail and data;[45] on the basis of their experience and expertise in their relevant fields, appellants can reasonably be expected to contribute to the informed resolutions of these questions when, and if, they arise before the District Court.

■ Finally, the District Court concluded that the other industry parties, granted intervention earlier,[46] would adequately represent the point of view of appellants. Once again, the problem with this disposition is that while the overall point of view might be shared, appellants' interest in the regulation of particular industries may not be represented by existing parties. For instance, none of the existing parties represents the interests of rubber manufacturers.[47] And the one chemical company that is currently a party, American Cyanamid Co., may not have interests that bear upon all of the industrial categories of concern to Union Carbide.[48] The District Court made no such particularistic inquiry as to interest here. We are thus not second-guessing a judgment of the District Court as to the exact range of interest of the applicants and parties before it, nor do we mean to limit the discretion of the District Court to decide when more representation would be redundant. But in exercising its discretion, the District Court must make a "discriminating appraisal of the circumstances of the particular case"[49] as to whether interests sufficiently overlap before denying intervention. In light of the "minimal burden" upon applicants to show that representation "may be" inadequate, *Trbovich, supra*, we find that the special and distinct interests

of appellants, even as to the existing industry parties, justify their admission under Rule 24(a)(2).

The order of the District Court, denying the motions for intervention, is reversed, and the case is remanded for the intervention by appellants to be allowed.

45. *See* n. 24 *supra.*

46. *See* n. 7 *supra.*

47. Category number sixteen is "Rubber Processing," with eight subcategories.

48. The categories of interest to Union Carbide involve the manufacture of a broad range of chemicals and chemical products, including organic and inorganic chemicals, plastics, and synthetic materials. American Cyanamid Co. is a diversified manufacturing company with interests in many fields, including the manufacture of pharmaceuticals and chemicals. Appel-

lants contend that American Cyanamid may choose to guard its other interests more diligently than its interests in chemical manufacturing, thus making it an inadequate representative of appellants' interests. Moreover, appellants contend that the chemical operations of American Cyanamid are limited to certain product lines and do not reach all the chemical industry categories of concern to appellants.

49. 7A Wright & Miller, *Federal Practice and Procedure,* § 1909 at 533.