# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 5, 2012          Decided April 23, 2013

No. 12-5122

DEFENDERS OF WILDLIFE AND SIERRA CLUB,
APPELLEES

UTILITY WATER ACT GROUP,
APPELLANT

v.

BOB PERCIASEPE, IN HIS OFFICIAL CAPACITY AS ACTING
ADMINISTRATOR, UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01915)

*Kristy A.N. Bulleit* argued the cause for the appellant.
*James N. Christman* was on brief.

*Thomas J. Ward* was on brief for *amici curiae* National
Association of Home Builders et al. in support of the
appellant.

*Robert J. Lundman*, Attorney, United States Department of Justice, argued the cause for the federal appellee. *Madeline Fleisher* and *John L. Smeltzer*, Attorneys, were on brief.

*Jennifer Suzanne Peterson* argued the cause for appellees Defenders of Wildlife et al. *Abigail Dillen* was on brief.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Defenders of Wildlife and Sierra Club (collectively, Defenders) sued the United States Environmental Protection Agency (EPA) based on EPA's alleged failure to promptly promulgate revisions to certain effluent limitations and effluent limitations guidelines under the Clean Water Act (CWA), 33 U.S.C. §§ 1251 *et seq*. When Defenders filed its complaint, it simultaneously filed a proposed consent decree—signed by Defenders and EPA—establishing a schedule for EPA to initiate notice-and-comment rulemaking and make a formal decision whether to promulgate a new rule revising certain effluent limitations and effluent limitations guidelines. Utility Water Act Group (UWAG), an association of energy companies and three national trade associations of energy companies, moved to intervene but the district court denied UWAG's motion and entered the consent decree. UWAG appeals the denial of intervention and also asserts that—whatever our decision on the denial of intervention—we should vacate the district court order entering the consent decree because the district court lacked subject matter jurisdiction. We disagree. We affirm the denial of intervention—because UWAG lacks Article III standing—and, as there is no appellant with standing, we dismiss the remainder of the appeal.

**I.**

Section 301(a) of the CWA prohibits "the discharge of any pollutant by any person" into the waters of the United States except in compliance with the CWA. 33 U.S.C. § 1311(a). The CWA requires a point source[1] of pollution to satisfy effluent limitations.[2] *Id.* § 1311(b). "For the purpose of adopting or revising effluent limitations," the CWA requires EPA to develop effluent limitations guidelines (ELGs). *Id.* § 1314(b); *see also Our Children's Earth Found. v. EPA*, 527 F.3d 842, 848 (9th Cir. 2008), *cert. denied* 555 U.S. 1045 (2008) ("The specific effluent limitations . . . are determined by the terms of more general 'effluent limitation guidelines,' which are separately promulgated by the EPA."). EPA implements the requirements for individual point sources through the National Pollution Discharge Elimination System permitting scheme. *See* 33 U.S.C. §§ 1311(a), 1342.

The CWA establishes review and revision requirements for effluent limitations and ELGs. Section 301(d) provides that "[a]ny effluent limitation . . . shall be reviewed at least

---

[1] "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture." 33 U.S.C. § 1362(14).

[2] "The term 'effluent limitation' means any restriction established by a State or the [EPA] Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11).

every five years and, if appropriate, revised." *Id.* § 1311(d). Section 304(b) provides: " . . . the Administrator shall . . . publish within one year of October 18, 1972, regulations, providing guidelines for effluent limitations, and, at least annually thereafter, revise, if appropriate, such regulations." *Id.* § 1314(b). Section 304(m) requires EPA to publish a plan every two years that, *inter alia*, "establish[es] a schedule for the annual review and revision of promulgated effluent guidelines." *Id.* § 1314(m)(1)(A).

As EPA explained in its most recent section 304(m) plan:

> For over three decades, EPA has implemented sections 301 and 304 through the promulgation of effluent limitations guidelines, resulting in regulations for 57 industrial categories. Consequently, as part of its annual review of effluent limitations guidelines under section 304(b), EPA is also reviewing the effluent limitations they contain, thereby fulfilling its obligations under sections 301(d) and 304(b) simultaneously.

Notice of Final 2010 Effluent Guidelines Program Plan, 76 Fed. Reg. 66,286, 66,289 (Oct. 26, 2011). One category of effluent limitations and ELGs that applies to UWAG's members[3] is the "Steam Electric Power Generating Point

---

[3] The Steam Electric effluent limitations and ELGs "are incorporated into National Pollutant Discharge Elimination System (NPDES) discharge permits issued by EPA and States" and "apply to steam electric power plants using nuclear- and fossil-fueled steam electric power plants nationwide." Environmental Protection Agency, *Spring 2010 Semiannual Regulatory Agenda* 148 (2010), *available at* http://www.epa.gov/lawsregs/documents/regagenda book-spring10.pdf

Source Category" (Steam Electric). EPA first promulgated effluent limitations and ELGs for the Steam Electric Category in 1974, *see* Steam Electric Power Generating Point Source Category, 39 Fed. Reg. 36,186, 36,186 (Oct. 8, 1974), and last revised them in 1982, Steam Electric Power Generating Point Source Category; Effluent Limitations Guidelines, Pretreatment Standards and New Source Performance Standards, 47 Fed. Reg. 52,290, 52,292 (Nov. 19, 1982).

On September 14, 2009, Defenders wrote to EPA, declaring that it intended to sue EPA for failing to "conduct and complete a review" of Steam Electric effluent limitations and ELGs under sections 301(d) and 304(b). Joint Appendix (JA) 22. On September 15, EPA issued a press release stating that it "plan[ned] to revise the existing standards for water discharges from coal-fired power plants." Press Release, Environmental Protection Agency, EPA Expects to Revise Rules for Wastewater Discharges from Power Plants (Sept. 15, 2009), *available at* http://yosemite.epa.gov/opa/admpress .nsf/d0cf6618525a9efb85257359003fb69d/ce5c2d398240af02 852576320049a550!OpenDocument; *see also Notice of Availability of Preliminary 2010 Effluent Guidelines Program Plan*, 74 Fed. Reg. 68,599, 68,608 (Dec. 28, 2009) ("EPA has decided to pursue an effluent guidelines rulemaking for the Steam Electric Power Generating (Part 423) category."). In its Spring 2010 Regulatory Agenda, EPA projected its issuing a notice of proposed rulemaking for the Steam Electric category by July 2012 and final action by March 2014. *See* Environmental Protection Agency, *Spring 2010 Semiannual Regulatory Agenda* 148 (2010), *available at* http:// www.epa.gov/lawsregs/documents/regagendabook-spring10.p df. EPA intended to engage in the rulemaking because "[i]n a study completed in 2009, EPA found that the current regulations, which were last updated in 1982, do not adequately address the pollutants being discharged and have

not kept pace with changes that have occurred in the electric power industry over the last three decades." *Id.*

On November 8, 2010, apparently upon reaching a settlement with EPA, Defenders filed a complaint against EPA in district court. Simultaneously, EPA and Defenders filed a consent decree and joint motion to enter the consent decree. The complaint alleges that the action "arises under the citizen suit provision of the Clean Water Act," Compl. ¶ 5,[4] and contends that EPA failed to fulfill its nondiscretionary duty to review and, if appropriate, revise the Steam Electric effluent limitations and ELGs. The consent decree provides, *inter alia*, that (1) by July 23, 2012, EPA "shall sign . . . a notice of proposed rulemaking pertaining to revisions to the Steam Electric Effluent Guidelines under the Clean Water Act," Consent Decree ¶ 3; and (2) by January 31, 2014, EPA "shall sign . . . a decision taking final action following notice and comment rulemaking pertaining to revisions to the Steam Electric Effluent Guidelines under the Clean Water Act," *id.* ¶ 4. The consent decree allows the parties to modify the timeline by mutual agreement or, failing agreement, through a dispute resolution procedure in district court. It further provides that it cannot be read to "limit or modify the discretion accorded EPA by the Clean Water Act or by general principles of administrative law." *Id.* ¶ 15.

On November 16, 2010, only eight days after the complaint was filed, UWAG moved to intervene as a party

---

[4] 33 U.S.C. § 1365(a)(2) provides that: "Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator."

defendant—both as of right and permissively—pursuant to Federal Rule of Civil Procedure 24(a) and (b). It sought to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim; alternatively, it sought to weigh in on the rulemaking schedule. On March 18, 2012, the district court denied the motion. *See Defenders of Wildlife v. Jackson*, 284 F.R.D. 1 (D.D.C. 2012). The court held that it had jurisdiction under the CWA's citizen-suit provision and that UWAG had no right to intervene under Rule 24(a) because, *inter alia*, UWAG lacked Article III standing. *See id.* at 4-8. It also rejected UWAG's alternative motion to permissively intervene under Rule 24(b). *Id.* at 8. On March 19, 2012, the district court signed and entered the consent decree. Since the decree was entered, the district court has entered three stipulated extensions to the consent decree's deadlines.[5]

On April 17, 2012, UWAG timely appealed the district court order denying its motion to intervene. UWAG also purported to appeal the district court order entering the consent decree and the first of the stipulated extensions.

## II.

In addition to challenging the district court order denying its motion for intervention, UWAG maintains that we should

---

[5] The first stipulated extension, filed April 2, 2012, changed the deadline for EPA to issue a notice of proposed rulemaking from July 23, 2012 to November 20, 2012 and the deadline for EPA to take final action from January 31, 2014 to April 28, 2014. The second stipulated extension, filed September 20, 2012, extended the dates to December 14, 2012 and May 22, 2014, respectively. The third stipulated extension, filed December 10, 2012, extended the December 14, 2012 date to April 19, 2013 and left the May 22, 2014 date unchanged.

first decide whether the district court had jurisdiction. We disagree with both arguments.

### A.

We first address UWAG's asserted right to intervene. We review the denial of a motion to intervene *de novo* for issues of law, for clear error as to findings of fact and for abuse of discretion on issues that "involve a measure of judicial discretion." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 732 (D.C. Cir. 2003). Rule 24(a)(2) provides: "[o]n timely motion, the court must permit anyone to intervene who," *inter alia*:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a). We have, not surprisingly, divided Rule 24(a)(2) into four elements:

> 1) the application to intervene must be timely, 2) the party must have an interest relating to the property or transaction which is the subject of the action, 3) the party must be so situated that the disposition of the action may, as a practical matter, impair or impede the party's ability to protect that interest, and 4) the party's interest must not be adequately represented by existing parties to the action.

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Reich*, 40 F.3d 1275, 1282 (D.C. Cir. 1994).

We also require a party seeking to intervene as of right to demonstrate Article III standing. *In re Endangered Species Act Section 4 Deadline Litig.*, 704 F.3d 972, 976 (D.C. Cir. 2013); *see also Jones v. Prince George's Cnty., Md.*, 348 F.3d 1014, 1018-19 (D.C. Cir. 2003) (Article III standing satisfies second element of Rule 24(a)(2)). We review standing *de novo*. *Section 4 Deadline Litig.*, 704 F.3d at 976.

UWAG asserts that it has representational standing. "An association only has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests it seeks to protect are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members[.]" *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002). The parties dispute only the first of these elements—whether UWAG's members would have standing to sue in their own right.

To establish that a UWAG member has Article III standing in its own right, UWAG must demonstrate that the member has incurred " '[1] an actual or imminent injury in fact, [2] fairly traceable to the challenged agency action, [3] that will likely be redressed by a favorable decision.' " *N.Y. Reg'l Interconnect v. FERC*, 634 F.3d 581, 586 (D.C. Cir. 2011) (quoting *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1219 (D.C. Cir. 2009)). "An injury in fact is 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.' " *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). An injury is particularized if it affects the party asserting standing " 'in a personal and individual way.' " *Id.* (quoting *Lujan*, 504 U.S. 560 n.1). UWAG asserts two bases for its members' standing. We reject both.

1.

UWAG first argues that its members have standing because the consent decree imposes too strict a timeline for EPA to decide whether and when to engage in rulemaking. According to UWAG, the timeline provides too little time for notice and comment such that its members will not have an adequate opportunity to participate in the rulemaking, making it more likely that EPA will promulgate a rule economically harmful to its members.

At the outset, we note that this case is not a "procedural injury" case. "Where plaintiffs allege injury resulting from violation of a procedural right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability, but not the issues of injury in fact or causation." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005); *but see Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). UWAG has not identified a procedural requirement that either EPA has violated by agreeing to the consent decree or that is designed to protect UWAG's members' concrete interests.

UWAG first argues that the consent decree violates its members' asserted right to "be[ ] subject to such a rulemaking *only* to the extent the statute commands it or authorizes EPA, in its informed discretion, to undertake it." *See* Appellant Br. 27 (emphasis in original). We recently rejected a similar "discretion" argument in *Section 4 Deadline Litigation*. In that case, the Safari Club, an association whose members hunt three species of animals, sought to intervene in an action brought by environmental plaintiffs against the Secretary of

the United States Department of the Interior and the U.S. Fish and Wildlife Service seeking to compel the government to comply with deadlines set forth in the Endangered Species Act. 704 F.3d at 974-75. The plaintiffs and the government had reached settlement agreements in which the government agreed, *inter alia*, to decide by a particular date whether to list the three species as "endangered" or "threatened" or find both listings "not warranted." *Id.* at 975. The Safari Club argued that its procedural rights were violated because "the settlement agreements establish an illegal procedure—the elimination of the Service's statutory authority to find that a proposal to list a species is warranted but precluded by higher priorities." *Id.* at 976 (quotation marks omitted). We rejected its argument: "The Safari Club has neither identified a statutory procedure that the settlement agreements require the Service to violate, nor shown that the [statutory provision at issue] is designed to protect its interest in delaying formal listing." *Id.* at 977. The same analysis applies here—whether UWAG is correct about EPA's discretion to determine when to conduct a rulemaking, UWAG has failed to identify a statutory procedure that the consent decree requires EPA to violate.

Nor is there a "procedural injury" flowing from the consent decree's notice and comment schedule—it allows thirteen months between the notice of proposed rulemaking and final action. UWAG cites no authority holding a thirteen-month notice-and-comment period is too short; UWAG simply asserts that it is too short compared to EPA's past rulemakings. That one rulemaking moves faster than another, however, does not mean that it results in procedural injury to UWAG members.[6] Having determined that UWAG members

---

[6] UWAG cites a memorandum from the Office of Management and Budget (OMB) encouraging federal agencies with rulemaking

cannot establish standing based on a procedural rights theory, we turn to their asserted injury resulting from the rulemaking process.

Significantly, the consent decree does not *require* EPA to promulgate a new, stricter rule. Instead, it merely requires that EPA conduct a rulemaking and then decide whether to promulgate a new rule—the content of which is not in any way dictated by the consent decree—using a specific timeline. But Article III standing requires more than the possibility of potentially adverse regulation. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 13 (D.C. Cir. 2011) (association lacked standing to challenge agency determination because, until determination applied to particular property or the agencies used it in an enforcement action, "any challenge to it is [ ] premature. In the meanwhile, [its] members face only the *possibility* of regulation, as they did before the [determination]" (emphasis in original)); *see also Alternative*

---

authority, "where appropriate and feasible, and to the extent permitted by law," to consider, *inter alia*, "[e]arly consultation with, advance notice to, and close engagement with stakeholders." Memorandum from Cass R. Sunstein, Administrator, Office of Information and Regulatory Affairs, Cumulative Effect of Regulations 1–2 (Mar. 20, 2012), *available at* http://www. whitehouse.gov/sites/default/files/omb/assets/inforeg/cumulative-effects-guidance.pdf. Whether EPA is in compliance with the memorandum, the memorandum simply provides guidance regarding Executive Order No. 13,563, 76 Fed. Reg. 3,821, 3,823 (Jan. 18, 2011), which provides: "This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, [or its] agencies." Neither the OMB memorandum nor the Executive Order provides support for UWAG's procedural injury argument.

*Research & Dev. Found. v. Veneman*, 262 F.3d 406, 411 (D.C. Cir. 2001) (per curiam) ("But NABR's rights were not impaired by the initiation of a rulemaking. . . . As the district court noted during the hearing on the motion to intervene, NABR will not be precluded from participating in the rulemaking and, if USDA decides to issue a final rule, NABR is not precluded from challenging that rule. . . . [T]he stipulated dismissal does not bind the agency in its rulemaking."); *cf. Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992) ("Allegations of injury based on predictions regarding future legal proceedings are . . . too speculative" to support showing of "current or even impending injury[.]"). Nor is Article III standing established by an inability to comment effectively or fully. *Int'l Bhd. of Teamsters v. Transp. Sec. Admin.*, 429 F.3d 1130, 1135 (D.C. Cir. 2005) ("[T]he 'mere inability to comment effectively or fully, in and of itself, does not establish an actual injury.' " (quoting *United States v. AVX Corp.*, 962 F.2d 108, 119 (1st Cir. 1992))). That the consent decree prescribes a date by which regulation *could* occur does not establish Article III standing.[7]

UWAG's reliance on our holding in *Natural Resources Defense Council v. Costle*, 561 F.2d 904 (D.C. Cir. 1977), a case factually similar to this case, is unavailing. In *Costle*, environmental plaintiffs submitted to the district court a

---

[7] UWAG's assertion notwithstanding, the standing question becomes no closer due to EPA's statements—made before entering into the consent decree—that it intended to update the Steam Electric effluent limitations and ELGs. UWAG has the burden to establish that the *consent decree*—not EPA's throat-clearing—will cause the injury of which it complains. The consent decree does not do so. In fact, it explicitly preserves EPA's discretion to promulgate a rule or decline to do so.

proposed settlement agreement that required EPA to initiate rulemaking for certain named pollutants pursuant to an agreed-upon schedule. *Id.* at 906. The settlement agreement permitted EPA to decline to issue any new rule but only if it met certain requirements set forth in the agreement and "promptly submit[ted] a statement under oath to the parties explaining and justifying the exclusion," in which event "the parties [could] presumably invoke the continuing jurisdiction of the District Court to review whether the exclusion squares with the grounds of the settlement agreement." *Id.* at 909. We held that intervenors subject to regulation under the new rules satisfied the third element of Rule 24(a)(2)—viz., "the denial of intervention works a practical impairment of [their] interests." *Id.* at 908-11.

But *Costle* does not dictate the outcome here. First, *Costle* does not analyze the standing issue and therefore has no precedential effect on the jurisdictional question before us. *See Hagans v. Lavine*, 415 U.S. 528, 535, n.5 (1974) ("[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.").[8] Furthermore, unlike here,

---

[8] There is no argument that *Costle* indirectly addressed standing by analyzing Rule 24(a)(2). Had *Costle* analyzed the second element of Rule 24(a)(2)—the potential intervenor must have "an interest relating to the property or transaction which is the subject of the action," *Costle* might dictate our result. *See Jones*, 348 F.3d at 1018-19 (if intervenor establishes Article III standing, it satisfies the second element of Rule 24(a)(2)) *Costle*, however, does not analyze this element. *See Costle*, 561 F.2d at 909 n.27 (noting only that district court found intervenors satisfied second element). Instead, *Costle* analyzed the third element—whether the

the proposed settlement agreement in *Costle* restricted EPA's discretion—if EPA decided not to promulgate a rule, it had to comply with the requirements of the consent decree, which requirements were enforced by the district court. *Compare Veneman*, 262 F.3d at 411 ("Significantly, the stipulated dismissal does no more than what the agency could have done by granting Alternative Research's pending agency petition for rulemaking, and *the stipulated dismissal does not bind the agency in its rulemaking*." (emphasis added)).

In sum, UWAG fails to establish Article III standing based on its members' alleged injury resulting from the rulemaking process.

2.

UWAG also asserts it has Article III standing because the consent decree is likely to be costly to its members. The CWA requires UWAG members to respond to EPA's information requests. *See* 33 U.S.C. § 1318(a)(A). UWAG argues that the consent decree's accelerated schedule forces EPA to request information from UWAG members on tight deadlines, which is expensive and time consuming. *See Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 457–58 (D.C. Cir. 2012) (party not directly regulated by agency rule had standing based on increased compliance costs resulting from regulation of a different party). For example, a UWAG member submitted an affidavit declaring that it had incurred over one hundred thousand dollars in costs because it had to respond to an EPA questionnaire about the Steam Electric effluent limitations and ELGs on a short timeframe.

---

denial of intervention would work a "practical impairment of [the putative intervenors'] interests."

But *the consent decree* did not cause and is not currently causing the alleged informational cost. Rather, EPA submitted the questionnaire at issue months before Defenders and EPA signed the consent decree and years before the district court entered it. *See* Questionnaire for Steam Electric Power Generating Effluent Guidelines (New), 75 Fed. Reg. 10,791 (Mar. 9, 2010). Indeed, Defenders challenge UWAG's standing argument on this very basis. *See* Br. for Pl.-Appellees 45-46 ("EPA submitted the relevant data requests before it reached a settlement with Plaintiffs."). UWAG, however, has not attempted to establish that its members continue to incur the costs of additional or more stringent information requests as a result of the consent decree. *See Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("[Past injury,] while presumably affording [plaintiff] standing to claim damages . . . does nothing to establish a real and immediate threat that he would again be [injured in the future.]"); *Worth v. Jackson*, 451 F.3d 854, 858 (D.C. Cir. 2006) ("While HUD's policies did allegedly injure Worth in the past, he seeks no relief for such injuries. . . . Instead, the basis for both his claims is that he intends to apply for new positions and promotions . . . . For standing purposes, then, we limit our inquiry to determining whether that prospective injury qualifies as an injury in fact." (quotation marks omitted)).

While we treat UWAG's "factual allegations as true and must grant [the intervenor] the benefit of all inferences that can be derived from the facts alleged," *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (quotation marks and ellipses omitted), UWAG provides no more than speculation to support its argument that the consent decree—as opposed to EPA's actions *aliunde* the consent decree—caused or will cause increased information gathering costs. Accordingly, UWAG cannot establish its members' standing based on increased costs.

### *B.*

UWAG also contends that the district court erred in rejecting UWAG's alternative argument that it is entitled to intervene permissively under Rule 24(b). Rule 24(b) allows for permissive intervention as follows:

> (1) In General. On timely motion, the court may permit anyone to intervene who . . .
>
>> (B) has a claim or defense that shares with the main action a common question of law or fact. . . .
>
> (3) Delay or Prejudice. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Fed. R. Civ. P. 24(b). "It remains . . . an open question in this circuit whether Article III standing is required for permissive intervention." *Section 4 Deadline Litig.*, 704 F.3d at 980. The district court concluded that UWAG's claim "share[d] with the main action a common question of law or fact" but that the UWAG's intervention would "unduly delay . . . the adjudication of the original parties' rights" because UWAG challenged the court's subject matter jurisdiction. *Defenders of Wildlife*, 284 F.R.D. at 8 (quotation marks omitted). UWAG asserts that the district court abused its discretion in finding that its intervention would cause delay.

"The denial of a Rule 24(b) motion is not usually appealable in itself, although the court may exercise its pendent appellate jurisdiction to reach questions that are inextricably intertwined with ones of which we have direct jurisdiction." *Section 4 Deadline Litig.*, 704 F.3d at 979. In at least two cases, however, we have declined to review the

denial of a Rule 24(b) motion once we determined the potential intervenor lacked standing. *Id.* at 980; *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 32 (D.C. Cir. 2000) ("In view of the unresolved standing issue, however, we think it inappropriate to exercise our pendent jurisdiction."). Here, too, given UWAG's lack of Article III standing, we decline to reach the Rule 24(b) issue.

## *C.*

Even if it cannot intervene, UWAG asserts that we should nonetheless consider its arguments regarding the district court's subject matter jurisdiction. We disagree.

"The power of federal courts to hear and decide cases is defined by Article III of the Constitution and by the federal statutes enacted thereunder." *Karcher v. May*, 484 U.S. 72, 77 (1987). We have jurisdiction over, *inter alia*, "appeals from all final decisions of the district courts." 28 U.S.C. § 1291. "The rule that only parties to a lawsuit, or those that properly become parties, [*e.g.*, through intervention,] may appeal an adverse judgment, is well settled." *Marino v. Ortiz*, 484 U.S. 301, 304 (1988) (per curiam); *see also id.* ("[W]e hold that because petitioners were not parties to the underlying lawsuit, and because they failed to intervene for purposes of appeal, they may not appeal from the consent decree approving that lawsuit's settlement . . . ."); *cf.* Fed. R. App. P. 3(c)(1)(A) ("The notice of appeal must: specify the party or parties taking the appeal . . . .").

There are a few exceptions to this general rule, e.g., if the district court order "effectively [binds] a non-party." *United States v. LTV Corp.*, 746 F.2d 51, 53 (D.C. Cir. 1984). The exceptions "are limited," however, and "the fact that a decision against a defendant may practically [affect] a third party is not ordinarily enough for appellant status absent

intervention or joinder in the trial court." *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 41 (1st Cir. 2009); *see also Marino*, 484 U.S. at 304 ("[T]he better practice is for such a nonparty to seek intervention for purposes of appeal . . . .").

Because a party *unsuccessfully* appealing a denial of intervention is not a "party," it may not obtain review of any district court holding other than the denial of intervention. *See Section 4 Deadline Litig.*, 704 F.3d at 980 (affirming denial of intervention and thus not "reaching the Safari Club's objections to the settlement agreements"); *Veneman*, 262 F.3d at 406 ("[B]ecause the district court correctly denied intervention, NABR is not a party to the action and lacks standing to appeal from either the stipulation of dismissal or the order denying its Rule 60(b) motion, which challenged the stipulated dismissal."); *United States v. British Am. Tobacco Australia Servs., Ltd.*, 437 F.3d 1235, 1240 (D.C. Cir. 2006) ("We have stated many times that failed intervenors may not appeal District Court actions to which they are not a party.").

UWAG argues for an exception to this rule, contending that the general prohibition on non-party appeals must yield to the doctrine that "every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.' " *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). But we have this obligation only to the extent we have authority to act in the first place, that is, if *we* have jurisdiction. *Salazar ex rel. Salazar v. District of Columbia*, 671 F.3d 1258, 1261 (D.C. Cir. 2012) ("Because we are a court of limited jurisdiction, our inquiry must always begin by asking whether we have jurisdiction to decide a particular appeal."). If we lack jurisdiction, we cannot vacate the district court's order for lack of jurisdiction because we lack the power to do so. *See Bender*, 475 U.S. at 546 ("On every writ

of error or appeal, the first and fundamental question is that of jurisdiction, *first, of this court*, and then of the court from which the record comes." (emphasis added)).

Applying these principles in a fairly recent case, we addressed a prospective intervenor's jurisdictional challenge only *after* we concluded that it had the right to intervene. *See Acree v. Republic of Iraq*, 370 F.3d 41, 50-51 (D.C. Cir. 2004), *cert. denied*, 544 U.S. 1010 (2005), *abrogated in other part by Republic of Iraq v. Beaty*, 556 U.S. 848 (2009). In *Acree*, the United States sought to intervene in district court "for the sole purpose of contesting the subject matter jurisdiction of the District Court;" however, the district court denied intervention. *Id.* at 46-47. In so doing, it "considered its own subject matter jurisdiction and concluded that it retained jurisdiction." *Id.* at 47. On appeal, we declined to reach any of the "merits issues" (including the issue of subject matter jurisdiction) until *after* considering the propriety of the district court's denial of intervention. *Id.* at 49. We declared: "If the United States were not properly a party to this case, then it would have no right to appeal the District Court's judgment, and we would be required to dismiss this case without passing upon its merits for lack of a proper appellant." *Id.* (citation omitted). We ultimately concluded that intervention was proper and thus "reverse[d] the decision of the District Court denying the United States' motion to intervene and turn[ed] to the merits of the Government's jurisdictional challenge." *Id.* at 51. While we have jurisdiction to decide UWAG's appeal of the district court order denying intervention, because we conclude that the district court properly denied that motion, UWAG, a non-party, cannot appeal any other issue.

For the foregoing reasons, we affirm the district court's denial of UWAG's motion to intervene and dismiss the appeal in all other respects.

*So ordered.*